Laureldale Cemetery Co., Appellant, *v.*
Reading Company.

316

317

Argued January 27, 1931. Before FRAZER, C. J., WALLING, SIMPSON, KEPHART and MAXEY, JJ.

*Robert T. McCracken,* with him *Wellington M. Berto-let* and *Laurence H. Eldredge,* for appellant.—In order to obtain just compensation it is necessary that every attribute of property which gives it value should be taken into consideration and that any peculiar use or adaptability which the particular piece of property possesses should be weighed and considered through the course of years: McMillin Printing Co. v. R. R., 216 Pa. 504; Montgomery Co. v. Bridge Co., 110 Pa. 54; Allentown & C. Turnpike Co. v. Traction Co., 174 Pa. 273; Boom Co. v. Patterson, 98 U. S. 403.

Our courts have held that, "except as provided by statute, land dedicated for and used as a burying ground cannot be sold": Mt. Calvary M. P. Church Trustees, 272 Pa. 453; Chew v. Church, 237 Fed. 219; Woodland Cemetery Co. v. Ellison, 67 S. W. 14.

The law is definitely settled to the effect that just compensation for private property taken for public use is an essential element of due process of law as guaranteed under the Fourteenth Amendment to the federal Constitution: Consolidated Turnpike v. Ry., 228 U. S. 326, 330; Norwood v. Baker, 172 U. S. 269, 277; C., B. & Q. R. R. v. Chicago, 166 U. S. 226, 236, 241; McCoy v. R. R., 247 U. S. 354, 363.

When land is of a character not commonly bought and sold, an ordinary real estate agent is not a competent witness, however much he may know of marketable land in the immediate neighborhood, and witnesses familiar with its value for special purposes may testify: Michael v. Crescent Pipe Line Co., 159 Pa. 99; Pittsburgh, etc., Ry. Co. v. Vance, 115 Pa. 325; Struthers v. R. R., 174 Pa. 291.

*T. I. Snyder,* of *Zieber & Snyder,* for appellee.—A cemetery company has full power to sell or otherwise dispose of any part of its property not already conveyed for burial purposes so long as the sale proposed does not deprive lot-holders of the use of and reasonable access to their lots: McDonald v. Cemetery Co., 226 Pa. 77; Laureldale Cemetery Co. v. Reading Co., 289 Pa. 6.

This court has repeatedly held that when a witness is offered for the purpose of placing an estimate of value on the property and it appears, either on preliminary cross-examination of the witness or subsequently thereto, that the witness's method of estimating the value of the property or method of arriving at such estimate was improper or based on improper, conjectural, and speculative factors, and not in accordance with the rule governing such cases, his testimony as to the value of the property should be excluded, or, if already given, should be stricken out: Hamory v. R. R., 222 Pa. 631; Bond v. Phila., 218 Pa. 475; Kleppner v. R. R., 247 Pa. 605; White v. R. R., 229 Pa. 480; Hall v. R. R., 262 Pa. 292;

Hamilton v. R. R., 190 Pa. 51; Schuylkill Val. R. R. v. Cleary, 125 Pa. 442.

Without quoting therefrom we wish to cite the following cases where the principle laid down in the Cleary Case has been followed and applied: Gorgas v. R. R., 215 Pa. 501; Hamory v. R. R., 222 Pa. 631; Kleppner v. R. R., 247 Pa. 605; Hall v. R. R., 262 Pa. 292; Ogden v. R. R., 229 Pa. 378; Schuylkill R. R. v. Stocker, 128 Pa. 233; Schuylkill Nav. Co. v. Thoburn, 7 S. & R. 411; Cox v. R. R., 215 Pa. 506.

The "stone quarry" cases such as Reading & Pottsville R. R. v. Balthaser, 119 Pa. 472, and 126 Pa. 1; Cole v. Power Co., 216 Pa. 283, and the case of Searle v. Ry., 33 Pa. 57, are also in point.

Dorlan v. R. R., 46 Pa. 520; Hamilton v. R. R., 190 Pa. 51; Searle v. R. R., 33 Pa. 57; Greenfield v. Phila., 282 Pa. 344, and the quarry cases already cited by us, also have a bearing on the question involved in this objection.

OPINION BY MR. JUSTICE MAXEY, March 16, 1931:

The question before us for decision is this: When 8¼ unused acres of a total cemetery plot of 117 acres are taken by a railroad company under eminent domain proceedings, what is the proper measure of damages? Appellant claims that the proper measure is the value of the land for sepulture purposes. The court below found the proper measure to be the difference in the market value of appellant's premises before and as unaffected by the taking and the market value of appellant's premises after and as affected by the taking. The case was tried on this theory, and a verdict was rendered for the cemetery company for $39,906.16. The plaintiff appealed.

The appellant is a cemetery company organized in 1923. It acquired shortly thereafter three tracts of land separated only by highways and a railroad, total-

ing about 117 acres located five miles from the center of Reading. It paid about $500 an acre for this land.

On April 21, 1927, the appellee adopted a resolution appropriating a right-of-way for railroad purposes, varying in width from 95 to 190 feet across the northern half of this cemetery plot. Up to that date the cemetery company had expended $92,000 in developing the cemetery. Twelve hundred lots had been sold and 417 interments made. The development, sale and interments had been confined to the southern half of the property. No interments had been made nearer than 600 feet to the land appropriated. The appropriation takes about 8¼ acres of the 117 acres of the cemetery plot. The appellant objects to the application in this case of the ordinary measure of damages, i. e., the difference in market value, and claims that this measure would not secure to the appellant its constitutional "just compensation." The appellant's idea of just compensation is revealed in the testimony and offer of testimony by LeVan Bollinger, president of the appellant company. The court refused to let him give his estimate of the value of the land taken because this estimate was based on these factors, to wit: (a) $1.27 a square foot for which sepulture rights were then being sold; (b) estimate of increase in this sale price during future years; (c) the number of square feet of land available for sepulture purposes in the entire tract; (d) 30 years' estimate of the time in which all lots for sepulture would be sold in this tract. He then arrived at a figure designated "discounted value." This designation was used by appellee's attorney in cross-examination, but was apparently accepted by the witness Bollinger. From this value he deducted a gross sum for the cost of future development and also the statutory 10% for perpetual care. He made no allowance for sales commissions, for advertising or for overhead. Neither did he take into consideration the value of land in the immediate neighborhood. Counsel for appellant aptly describes Bollinger's method

of assessing value as follows: "The present worth of each year's sales during the established life of the cemetery were then added together. From this figure Mr. Bollinger deducted a lump sum which represented the cost of developing the entire cemetery according to the universal experience of cemeteries and the experience of the Laureldale Cemetery Company with its own cemetery." The court did not permit the witness to tell what the resulting figure would be, as it was based on conjectural factors. The exclusion of this testimony is the subject of the first assignment of error.

It was conceded at the argument that if appellant's measure had been adopted, the resulting figure would be $26,000 an acre. As the land cost about $500 an acre three or four years previously, this prima facie looked like real estate alchemy. A study of the processes by which this result was reached confirms this prima facie impression.

It is the settled law of Pennsylvania that the proper measure of damages for lands taken under eminent domain is the difference between the market value of the land before and after the appropriation: Pittsburgh & Western R. R. Co. v. Patterson, 107 Pa. 461; Hall et al. v. D., L. & W. R. R., 262 Pa. 292. Appellant contends that it presents a case that calls for an exception to this rule. What is there so exceptional about the land appropriated as to justify the creation and application of a new measure of value to it?

The only thing exceptional about this land is, first, that it has been selected as part of a cemetery site; and, second, it is claimed for it that as a cemetery site it possesses exceptional advantages. If these or similar features make any land appropriated under eminent domain an exception to the established rule for measuring damages, the quantity of appropriated land which will hereafter be equally entitled to exceptional value measuring will soon make the application of the old rule the exception. Every owner of acreage which is likely

to be appropriated under eminent domain will be tempted to designate his land as an airport, a public golf course, an amusement park, a fox farm or a peach orchard, or something else distinctive, and by so using a portion of it give all of it the status claimed. Future values of the entire tract based on anticipated profits would be conjectured, and the present worth of this future value would become the measure of damages for any of the land taken. The owner of the "airport" or the "golf course" could with plausibility equal to appellant's make the argument that there is no other site within a given area so well adapted for the projected purpose as his own particular holding. Any owner of acreage might set out young peach trees on a portion of his tract, leaving the remainder of the tract unused, and if a small segment of the remainder be appropriated he could demand exceptional damages because, according to his claim, the land so taken was especially adapted by reason of soil, location, accessibility to market, etc., to raising and selling peaches at a profit, and he could further aver that the remainder of the land would ultimately be planted and great profits result therefrom.

The obvious implications in the acceptance of appellant's formula lead to the instinctive rejection of it, and this rejection soon finds support in reason. If the land taken was actually yielding profits, as was the toll bridge and its franchises in the case emphasized in appellant's paper book, Montgomery Co. v. Bridge Co., 110 Pa. 54, then its value before being appropriated would bear a close relationship to its net income capitalized, as is the case with all property permanently devoted to a business to which it is adapted. As Justice PAXSON said in that case: "Their [i. e., the bridge franchises, etc.] value depends upon their productiveness. If they yield no money return over expenditures, they would possess little if any present value. ...... The income from the bridge was a necessary and proper subject of inquiry before the jury." Justice PAXSON fur-

ther said: "The use referred to is the only one for which the bridge is capable." In the case before us, the plot of land actually taken had no present "productiveness." It was a current liability rather than an asset, because money would have to be expended upon it before it could be sold and used for sepulture. If burial plots in the land taken were actually being let out at an annual rental for graves, as is the custom in some countries, and the land could not be used for any other purpose, there would be presented an analogy to the bridge case, and the annual net profit capitalized would be an important factor in estimating the land's value. Values based on current earnings have a dependable foundation; values based on anticipated earnings have not.

The case of Allentown & Coopersburg Turnpike Co. v. Lehigh Valley Traction Co., 174 Pa. 273, is cited by appellant. We find in that case no support for appellant's position. There the traction company entered upon and used a part of the road of the turnpike company. Upon appeal here from the award of damages below, the court said: "The contention of the plaintiff is that it is entitled to recover compensation for all losses which are the direct and immediate result of the act of the defendant in taking possession of a portion of the road and laying its tracks and running its cars thereon, and that the measure of damages is the difference in value of the property of the turnpike company as a whole before and after the construction of the railway. The learned judge adopted substantially the plaintiff's view, but he carefully excluded from the computation of damages any loss of revenue from tolls occasioned by the fact that new and improved facilities for travel were furnished, and that persons who would otherwise have driven over the turnpike rode in the cars to and from points on the line of the railway. ...... The measure of damages was limited to the direct and immediate consequences of the occupation and use. ...... The plaintiff was permitted to show the decrease in revenues and the depre-

ciation in the market value of its capital stock as evidence of the damage sustained. The admission of this testimony was in harmony with the rulings in Montgomery Co. v. Schuylkill Bridge Co., 110 Pa. 54." The judgment was affirmed. That was another case where the actual net earnings of the property taken were a factor in the valuation of the property before the taking. In the case before us there was and could be no offer to show decrease in appellant's current revenues by the railroad's taking of a portion of the cemetery plot.

We find nothing in this case which justifies the application of an exceptional measure of damages to the land appropriated. The market value measure of damages meets all the requirements of just compensation in this case, for if any piece of land possesses attributes that stimulate competition for its ownership, this affects its market value favorably. If there is no competition for its ownership, trial judges cannot permit values to be increased in the courtroom by a calculation based on anticipated profits, for it is a common experience that there is a painful gap between profits anticipated and profits realized. Mere prospects have little pecuniary value.

Appellant contends that no possible formula which involves market value in the ordinary sense of that term can be applied in such a case as this because, in the language of the question assented to by witness Bollinger, there are no "exchanges where cemeteries are sold." If it is true that the market value formula cannot be applied to land after it is given the status of a cemetery site, it is difficult to perceive what other formula can be applied that will with reasonable certitude lead to a just compensation. Surely a formula based on the utterly conjectural factor of future profits cannot meet this requirement. The introduction of this formula into land damage cases would be prolific in unjust verdicts. Who can say with approximate certainty that no other land within easy motoring distance of

Reading would be as suitable for cemetery sites as the land appropriated, or that rival cemeteries, or even a crematory, would not be established and appellant's optimistic calculations thereby be upset? There are according to the record 15 or 18 cemeteries within a radius of ten miles of the center of Reading, and their sites must be as suitable as the Laureldale Cemetery, for they all antedate it.

Appellant attempts to meet this argument by offering the testimony of witnesses Seidell and Eisenbrown, the exclusion of whose testimony constitutes the subject of the fourth, fifth and seventh assignments of error. The offer was to prove by these witnesses that they personally examined all other tracts lying within a radius of ten miles of the city center of Reading of an area of 100 acres, that they found no other tract within this radius that did not contain bad grades, rocks, wet soil, lack of drainage, absence of water supply, or inadequate transportation facilities, and that the tract which was selected by these witnesses for the Laureldale Cemetery Company is the only tract within ten miles of the city center of Reading which contains all of the advantages possessed by it, namely, good drainage, good soil for burial, contiguity to main highways, an extent of 100 acres, and accessibility to a municipal water supply for the supply of water to the cemetery. The purpose of the offer was to furnish theoretical support for the measure of damages claimed by appellants, but since the court properly took the view that this measure of damages, no matter how plausibly supported in theory, would be an impracticable and unsafe one, this supporting evidence was immaterial and was properly rejected. We use the phrase "theoretical support" because, if the witnesses testified to the facts promised, this testimony would be of little practical value and would introduce collateral issues. For example, the supporting evidence offered was based on the assumption that land *more* than ten miles from the city center of Reading would not be

available as cemetery sites. Appellee would doubtless have challenged this assumption and persuasively contended that in these days of good roads and swiftly moving vehicles, a cemetery even twenty miles away is as accessible as a cemetery three miles away was under the conditions existing two decades ago. Then again, what sort of a personal examination would be sufficient to support the sweeping conclusions of these witnesses? Land within a radius of ten miles would be land embraced in a circle twenty miles in diameter and containing 314 square miles. Deducting 214 square miles as a liberal estimate of the land obviously unavailable for cemetery purposes, leaves 100 square miles, or 64,000 acres, to be examined to determine whether this land contains: (1) bad grades, (2) rocks, (3) wet soil, (4) lack of drainage, (5) absence of water supply, or (6) inadequate transportation facilities. The first four of these factors manifestly could not be determined by superficial examination. Even factors 5 and 6 would require considerable examination. Water supply might be found for other tracts by piping, or by drilling an artesian well; and as to transportation facilities, new roads are constantly being built and short roads to cemetery sites are frequently opened at little expense, from the main traveled highways. Furthermore, if all of these factors could be definitely established after a most painstaking examination, these facts would merely give support to a measure of value based entirely on the uncertain elements of future profits. If the area in question obviously possessed the exclusive cemetery advantages claimed for it, these factors would long ago have enhanced its market value automatically, as it would lead men ever alert for gain to sense its value for the purposes stated and to compete for its ownership, just as a corner lot in a growing city has a high market value resulting from competition for its ownership. But an owner's visions of his land's values make an unsafe guide for juries.

Appellant bases the argument against the applicability of the market value rule to this case on the proposition that "it is not [legally] possible after once opening a cemetery to devote the land to other purposes." This court has held otherwise: McDonald v. Monongahela Cemetery, 226 Pa. 77. When this case (of Laureldale Cemetery) was before this court in 1927 (289 Pa. 6) for a decision on the question as to whether or not the cemetery company could resist the condemnation proceedings of the railroad company, it was held, in an opinion by the present Chief Justice, that the proceedings could not be resisted and that plaintiff as a private corporation had "full power to sell or otherwise to dispose of its property not already conveyed for burial purposes, especially as it appears that the land appropriated for the right-of-way in question has not at the present time been devoted to such purposes, nor does the appropriation interfere with the use of the remainder of the cemetery property for the purpose intended." The appellant claims that this statement was not necessary to a decision in that case and was in conflict with the ruling of this court in Mt. Calvary M. P. Church Trustees, 272 Pa. 453, from the opinion in which case appellant quotes the following: "Except as provided by statute, land dedicated for and used as a burying ground cannot be sold." We regard this quoted statement as unnecessary to a decision in that church trustee case. The excerpt quoted cites in its support the following two cases from this court: (1) Brown v. Lutheran Church, 23 Pa. 495; and (2) Gumbert's App., 110 Pa. 496. In case 1, this court held that a conveyance by trustees of real estate used for religious purposes and for a cemetery would be legal only if ratified and confirmed by the cestuis que trust, i. e., the members of the congregation. In case 2, it held that a grant of land to church societies for the use and purpose of a church and cemetery is a grant for that special purpose, and when the purpose fails the land reverts to the donor

or his heirs, and persons who belonged to that church or who had relatives buried in the cemetery were clothed with the right to see that the trust was preserved. Neither of these cases are authority for the proposition that cemetery lands cannot be alienated and used for other purposes. Restriction on the alienation of property is never favored and is upheld only where positive law or public policy demand it. The proposition advanced by the appellant that cemetery land can never be used for purposes other than sepulture is denied by history and opposed by progress. In nearly every large city, buildings are now erected on sites of former graveyards. Railroads, factories, gas stations, and public and private buildings are often in these modern days found contiguous to cemeteries. The churchyard at Stoke Poges no longer possesses the quiet isolation Gray found there when he wrote his elegy. Franklin, Hamilton, John Hancock and tens of thousands of others rest, without protest from either the living or the dead, in spots only a few feet "from the madding crowd's ignoble strife."

Even if it were true that no part of a cemetery plot could be legally alienated, that would provide no justification for the measuring rule fashioned by the appellant. If in determining the value of part of a cemetery plot condemned under eminent domain a choice must be made between the market value of the land in that vicinity and conjectural value based on discounted future profits, there can be no doubt which choice justice dictates. The size of the verdict appealed from compared with the size of the appellant's demand for compensation for land which cost appellant only $500 an acre three years previously clearly indicates which rule more nearly guarantees "just compensation." Furthermore, all human experience indicates that land suitable for sepulture is not so rare anywhere as appellant's witnesses would have us believe it is in the vicinity of Reading, Pa. In the 150 years of Reading's history, the peo-

ple of that community have apparently had no difficulty in finding sites for 15 or 18 still active cemeteries within 10 miles from the center of Reading. In this era of good roads and motor vehicles, additional cemetery sites within easy motoring distance of Reading will doubtless be found when required. The import of the testimony of the president of the cemetery company is that any tract of land along a main highway, without much rock and with fair drainage and with a "beautiful outlook," makes a good cemetery site. These specifications ought not to be difficult to meet. If a large city should suddenly spring up in the vicinity of appellant's cemetery, giving lands in that vicinity a high market value, and a portion of the cemetery plot which was not used was desired for other than cemetery purposes, appellant would naturally insist that the market value rule should be applied, just as if a part of Trinity churchyard in New York City were vacant or should become vacant because of exhumations and should be appropriated, the owners would doubtless scorn compensation based on that land's value for sepulture purposes and would demand that the appraisal of its value be in keeping with the market value of other lands in the immediate neighborhood. The rule laid down by this court in Penn. Schuylkill Valley R. R. v. Cleary, 125 Pa. 442, and followed in numerous cases since that time, is as applicable when applied to land subdivided into burial lots as it is when applied to land subdivided into building lots. This court in that case held that it was improper to show "how many building lots the tract under consideration could be divided into, and what such lots would be worth separately. ...... The jury are to value the tract of land, and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot." These principles apply here. The land must be valued as land like any other land in its

vicinity, and not as sepulture lots to be turned into cash in the future.

This case was tried on the correct theory and all the rulings of the learned trial judge were in harmony therewith. The assignments of error 2, 3 and 11, relate to the alleged incompetency of defendant's witnesses McGowan and Leinbach, who testified as to value; but in the appellant's paper book appears this statement: "We frankly admit that if the position which the lower court took on the measure of damages is sound, then the admission of the testimony of the defendant's real estate experts was competent and proper." This position was sound and these assignments require no discussion.

All the assignments of error are overruled. The judgment is affirmed.