## Sechrist et al. *v.* Bowman et al., Appellants.

302

Argued March 15, 1932.   Before Frazer, C. J., Simpson, Kephart, Schaffer, Maxey, Drew and Linn, JJ.

*E. C. Higbee,* of *Higbee, Matthews & Lewellyn,* for appellant.—The measure of damages was improperly submitted to the jury: Valley Smokeless Coal Co. v. Hager, 292 Pa. 440; Oak Ridge Coal Co. v. Rogers, 108 Pa. 147; Kingston v. Coal Co., 241 Pa. 469; Boyle v. Crowthers, 84 Pa. Superior Ct. 18.

Every fact presented by the record demonstrates that this clay did not have "a present market value for operation as a going mine," and that it did not have "a market value for operating purposes at a price per ton, that is, what is known as a royalty": Ruthenberger v. Reading, 296 Pa. 423; Hall v. R. R., 262 Pa. 292.

Nothwithstanding appellants' slight and inconsequential operations, this field of clay is in fact for practical purposes virgin, and there is no evidence to show that it was at the time of the trespass "immediately available for operation," and that there was a then "present market for" it "at a price per ton."

There was no right to recover treble damages: Rhodes v. Coal Co., 238 Pa. 283; Matthews v. Rush, 262 Pa. 524; Mathey v. Milling Co., 283 Pa. 331.

Appellees' witnesses, Gaddis and Kennedy, were incompetent because they had no knowledge of the market value of lands and clay in the neighborhood at or about the time of the trespass, or at any other time: Hope v.

R. R., 211 Pa. 401; Michael v. Pipe Line Co., 159 Pa.
99; Pitts., Va., etc., R. R. v. Vance, 115 Pa. 325; Herbert v. Rainey, 162 Pa. 525.

The excessive verdict should not have been allowed to
stand: Howard Express Co. v. Wile, 64 Pa. 301; Smith
v. Pub. Co., 178 Pa. 481.

*H. S. Dumbauld,* for appellees.—The witnesses for defendants do not undertake to say that there was a market value for this vein of clay or for the entire body of
clay in that vicinity by the acre.

Under these circumstances the only fair way to value
the stolen clay was to compare it with other points in
Fayette County where like clay has been sold by the ton.

Plaintiffs are entitled to treble damages.

OPINION BY MR. JUSTICE MAXEY, April 11, 1932:

On February 24, 1909, the ancestor of the appellees
sold to the appellants all the fire clay, consisting of three
or more separate veins, underlying a farm of 76 acres,
except two blocks containing 14 acres and two acres respectively, together with complete mining rights and release of damages resulting to the surface from the mining and removal of the clay. The total consideration
was $2,000 for the 60 acres of clay and for four acres of
land besides.

The appellants in operating the clay mine, crossed the
boundary line and removed some of the reserved clay.
Appellees, brought suit. They claim that since 1918 at
least 21,750 tons of fire clay have been unlawfully mined
on their premises. Alleging that this trespass was committed knowingly, treble damages were demanded. The
issues submitted to the jury were: first, the quantity
of clay taken and converted; second, its value; and,
third, whether it was taken with or without knowledge
on the part of the takers.

This action has been tried three times and each time
the plaintiffs secured a verdict. At the first trial the

jury found there were 42,549 tons of clay removed and fixed compensation therefor upon a royalty basis of 13½ cents per ton, amounting to $5,744.11. Treble damages were not allowed. The trial judge reduced the verdict to $3,500. As no stipulation accepting it was filed by plaintiffs, a new trial was ordered. At the second trial the jury found the defendants knowingly and without the owner's consent removed and converted to their use clay from under plaintiffs' land to the amount of 21,500 tons and fixed the value thereof at nine cents per ton, and assessed treble damages. The verdict was for $5,805. The trial judge being of the opinion that seven cents per ton was a fair market value and that treble damages should be allowed, reduced the verdict to $4,515. The plaintiffs did not accept this reduction and a new trial was ordered. At the third trial the jury found there were 37,785 tons of clay removed and converted to defendants' use and that it had a value of 10 cents a ton, and allowed treble damages. The verdict was for $11,-335.50.

The court in its opinion declares that this is excessive, that seven cents a ton is a fair market value for this clay in place and that treble damages should be allowed and that the verdict should be $7,934.85. The court, however, declined to reduce the verdict, saying that to do so would simply mean another trial, as the plaintiffs are unwilling to file a stipulation accepting the reduced verdict because the defendants will appeal in order to have decided by this court the questions: (1) What was the proper measure of value of the clay taken? (2) Were plaintiffs' witnesses competent to express an opinion as to the royalty value of the clay taken? And (3) should the jury have allowed treble damages?

In submitting this case to the jury the trial judge permitted the jury to determine whether the clay taken should be valued on an acreage basis or on a royalty basis of so much a ton. The jury adopted the latter standard. Plaintiffs' engineer testified that defendants

had taken 37,785 tons of plaintiffs' clay. This would constitute a solid area of 1 and 9/20th acres of the three veins in this tract. Defendants' engineer testified that 21,250 tons of clay had been removed. This would constitute a solid area of 19/20ths of an acre of the three veins in this tract.

The defendants filed two motions, one that the verdict finding treble damages should be set aside, and the other that a new trial should be granted. The reasons advanced by defendants were these: First, that the clay should have been valued by the acre instead of upon a royalty basis; second, that two witnesses called by plaintiffs as to the value of the clay, were not competent; third, that treble damages should not have been allowed; fourth, that the verdict was excessive.

On the question of the valuation of the clay both parties agreed that the proper measure of damages is the value of the clay in place, but the defendants insist that it should be measured by the value per acre, while the plaintiffs contend that it should be measured by the value per ton, as the jury did value it. The defendants offered no evidence to show how much the clay was worth in place upon a royalty basis, but offered evidence to show the value of it by the acre. The plaintiffs offered evidence only to prove the value of the clay upon a royalty basis.

The ordinary standard of value of land in its original state is its value per acre. Lands containing coal, clay or other valuable minerals or materials are, before they are developed or before there are developments of similar mineral-bearing lands in the vicinity or mining district, usually sold on an acreage basis as was the clay lands sold by the plaintiffs' ancestor to the defendants in 1909. This court in Trustees of Kingston v. L. V. C. Co., 241 Pa. 469, said: "Ordinarily the value of coal in place is understood to mean its value in a state of nature; in other words, its acreage value in a solid body. As to virgin, undeveloped coal, this is a primary rule for as-

certaining the value of coal in place. This primary rule
should likewise prevail except in those cases in which
by reason of the location of the coal, its proximity to
mining operations, or its accessibility to transportation
facilities, it has a present market value on the royalty
basis." This court said in the second case of Kingston
v. L. V. C. Co., 241 Pa. 481, that "The royalty basis may
be adopted as a measure of damages if the facts warrant
the application of the rule. If the mine is immediately
available for operation and there is a present market for
the coal underlying the tract at a price per ton, this
method may be adopted in ascertaining the value of the
coal in place. If there is no such present market, then
the acreage value of the coal in its natural state would
be the proper measure of damages."

In the case before us the burden was upon the plain-
tiffs to present facts which would justify the application
of other than the ordinary acreage standard to deter-
mine the value of the clay taken. This burden the plain-
tiffs did not sustain. The plaintiffs called two witnesses
to prove that the value of the clay should be measured
on a royalty basis. One of these witnesses testified that
he knew of the practice of "handling clay on a royalty
basis in Mt. Braddock, Dunbar, Stewarton and Ohio-
pyle." How far these places were from the clay in ques-
tion was not stated. On cross-examination the witness
admitted that he knew of no sale or lease of any clay on
a royalty basis in the vicinity of the Sechrist [i. e., plain-
tiffs'] farm. In two of the four instances referred to by
the witness, the purchaser or lessee took only as much
clay as he wanted at so much a ton royalty without obli-
gating himself to take a definite amount in any period.
In one instance the witness said the lessee "got clay at
Indian Creek on a royalty and then he bought the land."

The other witness testified that at the time of the trial
he knew of no places in Fayette County where clay "was
handled on a royalty basis." His testimony was very
vague as to any instance where he knew of clay being

mined at any time on a royalty basis. He said he knew when clay was leased at Mt. Braddock on a royalty basis but he didn't disclose what the terms of the contract were or how far Mt. Braddock was from the clay in question. This witness also declared that the clay in controversy acquired a value on a royalty basis by the ton when the appellants started to work there. These witnesses estimate the value of the clay taken was respectively 12½ cents and 15 cents per ton. There was no evidence tending to prove or support the inference that the clay taken would have been as marketable on a royalty basis as the clay the witnesses vaguely testified about.

The testimony of these witnesses is not prima facie sufficient to warrant the adoption of a royalty basis in computing the value of the clay appropriated by the defendant company. If plaintiffs could have proved that there was in the vicinity of this clay a market or demand for clay in its native bed on a royalty basis and that this clay was, because of its quality and accessibility, marketable on that basis, the court would have been justified in permitting the jury to adopt and apply the royalty basis standard if they credited the evidence supporting it. For example, it sometimes happens in the coal mining regions that an area of unmined coal is so situated that it can be profitably mined from two or more near-by coal mines and if in such a situation it can be shown that there is a demand for coal such as would stimulate mining companies to compete for that area of unmined coal and if it could be further shown that coal in place in that vicinity is customarily sold or leased on a royalty basis, that would be the proper standard to gauge the value of that area of unmined coal. The same principle applies to clay mines. In the case before us we have a situation where 60 acres of land containing three veins of clay were sold in 1909 for a trifle less than $33.33 per acre to the appellants. About ten years later, the appellants mined some of the clay which had been reserved. Without showing that there had been any activity in the clay

mining industry in that section in which the land was situated (except appellants' activity), without showing any market or demand in that vicinity for clay land in its undeveloped state, without showing that there was any competition of clay mining companies for the clay in the area reserved or in other near-by areas, and without showing that the appellees themselves could have mined that clay at a profit; in short, without showing anything indicating that the clay reserved in its native state had much more value in 1918 and 1919 than it had in 1909 when the contiguous clay was sold for less than $33.33 an acre, the jury found that the acre and a half of clay mined by the defendants had an actual value of $3,778.50. In order to justify the conversion of an acre and a half of clay of a value of $50 in 1909 to a value more than seventy-five times as great nine or ten years later, no fact was proved except the fact that the defendant company was mining clay contiguous to the area of clay into which the defendants trespassed. Such a comparatively sudden rise in value must have something more to explain it than appears in this case before the courts can sustain an award based upon its alleged existence. Here it appears to be based on nothing more substantial than an arbitrary finding. As we said in Laureldale Cemetery Co. v. Reading Co., 303 Pa. 315, 321: "This prima facie looks like real estate alchemy."

When there is more than one operator mining in any given area or district a certain mineral and this mineral is a rare and valuable one for which in its native state there is brisk demand and competition, the exceptional measuring standard of royalty per ton supplants the normal measuring standard of so much per acre. In those areas or districts the use of the royalty-per-ton standard becomes in time a usuage which has the force of law, that is, it becomes the customary measuring standard of value of the mineral mined in that district. If mining in that district is later practically abandoned, the per acre standard may again prevail in valuing lands

containing some mineral. In the case before us there is nothing which gave the standard invoked by the plaintiffs the status of a customary standard in the locus of the controversy for measuring the value of that rather common compound known as clay. The mere presence of a railroad in that vicinity and the fact that appellants were mining clay in a contiguous tract were not enough to warrant the application of the royalty-per-ton measuring standard. There was no case made out for the application of an exceptional standard of value. If the defendants in taking one and 9/20th acres of plaintiffs' clay trespassed over several acres of the latter's property and this honey-combing permanently injured that property and resulted, as pleaded, "in the breaking up of a considerable portion of the surface, leaving the same in a rough and untillable condition and in the destruction of the surface as farming land suitable for raising crops, orchards and other products of like kind," plaintiffs would be entitled to prove as damages the resulting depreciation in the value of the surface of the entire property trespassed upon: Rabe v. Shoenberger Coal Co., 213 Pa. 252. In addition to this the plaintiffs would be entitled to the value of the clay taken from beneath the surface, this value to be calculated on a per acre basis, unless on a second trial the facts proved warrant the application of the royalty rule.

Damages means compensation for a legal injury sustained. The law requires that the damages awarded should bear a reasonable relation to the injury they compensate. An award of $2,500 damages for each acre of clay taken out of land which was sold for $33 per acre a decade previously, is, unless explained by facts other than those in this record, offensive to a normal sense of justice. While the plaintiffs should not lose anything by reason of defendants' unauthorized act, neither should they derive a profit from that act (unless treble damages for intentional trespass be construed as a "profit").

Value in a commercial sense is determined by the market demand for the thing valued. In the cross appeal in

Trustees of Kingston v. L. V. C. Co., 241 Pa. 481, 483, this court said that a "price per ton" may be adopted "when there is a present market for coal underlying a tract at a price per ton." The same rule applies to clay as to coal. The plaintiffs offered no evidence whatsoever showing a market at a price per ton for clay underlying the tract in controversy or underlying neighboring tracts. There is nothing in the record to show that the market demand for clay in its native bed was any greater at the time the defendants took the clay in controversy than it was when the land containing it was sold for about $33 per acre.

The Act of May 8, 1876, P. L. 142, section 1, cited in 18 P. S., section 2776, page 473, provides, inter alia, that: "If any person or corporation shall mine or dig out any coal, iron or other minerals, knowing the same to be upon the lands of another person or corporation, without the consent of the owner,.....the person or corporation so offending shall be liable to pay to such owner double the value of the said coal, iron or other materials so mined, dug out or removed, or in case of the conversion of the same to the use of such offender or offenders treble the value thereof, to be recovered, with costs of suit, by action of trespass or trover as the case may be." It is not disputed in this case that fire clay is within the "minerals" referred to in this act. If this question had been raised the following cases would be pertinent: Ruttledge v. Kress, 17 Pa. Superior Ct. 490; Hendler v. Lehigh Valley R. R. Co., 209 Pa. 256.

We agree with the court below that the evidence in this case presented a question for the jury as to whether or not the defendant company knew it was digging clay on another's land without the other's consent. If it did so, it must pay treble damages for the clay it knowingly took and converted to its own use. But because of the incorrect measure used in determining damages in this case, there must be a new trial.

The judgment is reversed with a venire.