ST. AGNES CEMETERY, Respondent, v. STATE OF NEW YORK, Appellant. (Claim No. 31967.)

Third Department, May 10, 1956.

*Jacob K. Javits, Attorney-General (Joseph H. Murphy* and *James O. Moore, Jr.,* of counsel), for appellant.

*Joseph J. Casey* for respondent.

GIBSON, J.   The judgment appealed from awarded claimant damages, on account of the appropriation of certain lands and of a permanent easement, within the limits of claimant's cemetery.

Prior to the appropriation on November 20, 1952, the entire cemetery contained approximately 150 acres.   The southerly portion of the cemetery consisted of 13.939 acres acquired in 1931 and 1938 and the witnesses for both parties treated this portion as the area affected by the appropriation.

From the 13.939 acre parcel the State appropriated approximately 2.975 acres in fee and a permanent easement over a parcel of approximately 0.246 acres.   The width of the fee portion is approximately 235 feet or, measured along the cemetery line on a skew, approximately 275 feet, upon which has been constructed a four-lane highway 72 feet wide, upon an embankment 200 feet wide at its base and 34½ feet high. The parcel taken for the easement is approximately 55 feet wide at right angles or 63.63 feet askew, upon which has been constructed an access road.   The road is 20 feet wide, exclusive of shoulders, and extends some 975 feet (of which 190 feet are within the cemetery) at a grade of minus 7.9% to the new highway above.   The new construction crosses the cemetery, completely separating the cemetery lands to the north and south of it.

On May 25, 1951, respondent entered into a contract with a cemetery development corporation to design and develop a portion of the cemetery, including the 13.939 acre parcel affected by the later appropriation, as a shrine, or "garden type", cemetery, in contrast to the "monument type" existing in the older part of the cemetery. There were actually developed four shrine areas to the north of the parcel here involved, the last being St. Joseph's Shrine which is adjacent to it. Another and important feature of the development planned was the construction of a new main entrance to the cemetery from Menands Road, which would have been advantageous and convenient, first, because the other entrance was obtained by means of an easement over lands of Albany Rural Cemetery and required passage over a railroad grade crossing and, second, because of the marked westward shift of the Albany area population.

That the lands taken and those affected by the appropriation were highly valuable for cemetery purposes is apparent from the testimony. Equally clear is the fact that, as cemetery lots, they would have been readily salable over a period of years and, in all probability, at regular intervals until completely sold. The claimant was incorporated in 1867, since which date some 50,000 to 60,000 interments had been made in its cemetery. Since that date, also, it has been a diocesan cemetery of the Roman Catholic Diocese of Albany and serves approximately 26 parishes in and about the city of Albany. By canon law and diocesan regulations, all communicants of the Roman Catholic Church residing in Albany must, on death, be buried in this cemetery, except for communicants in three parishes which have small parish cemeteries. In each of the four years immediately preceding the appropriation, the number of interments exceeded 700.

Thus the takings themselves were of valuable lands. Further, the damage to the adjacent lands was substantial. The highway and access road completely divided the parcel affected. The high embankment is obviously deleterious to the appearance of the cemetery and the heavy traffic on the four-lane highway and the access road must inevitably disturb its tranquillity, as well as the ceremonies attendant upon interments. Additional results are to restrict not only the cemetery's expansion and sales of lots, economically helpful to the maintenance of the cemetery as an entirety, but to reduce the income from interment fees and other charges.

The substantial issues for our determination arise from appellant's contention that the basis of compensation must be acreage value, treating the parcels appropriated and the remain-

ing lands damaged as vacant, unproductive lands, as against respondent's contention that the correct basis is the reasonable market value of the property for use as burial sites. Following the argument of this appeal, we directed a reargument (1 A D 2d 869) which served to clarify the factual issues as to damage.

There is a dearth of authorities, among the reported cases in New York, directly bearing upon questions of damage arising upon the appropriation of cemetery lands. Certain general principles, however, are fundamental. Market value "is to be fixed with due consideration of all its available uses". (*United States* v. *Miller,* 317 U. S. 369, 375.) "It is settled beyond question that respondents are entitled to recover the fair market value of their property based on the most advantageous use to which it could be put." (*Sparkill Realty Corp.* v. *State of New York,* 254 App. Div. 78, 82, affd. 279 N. Y. 656.)

The decision in *Cementerio Buxeda* v. *People of Puerto Rico* (196 F. 2d 177, certiorari denied 344 U. S. 876) seems to us in point. There the court held erroneous the exclusion by the trial court of evidence of sales of burial lots in the cemetery involved and in other cemeteries as well, and stated (196 F. 2d 181), " The court appears to have disregarded the nature of the property and its capabilities. The income derived from the sale of burial sites in this and other cemeteries was an ascertainable amount not based on speculative considerations. The income was not such that the skill of the management of the property was important. A prospective purchaser would obviously look at the sale of burial sites made, the capacity of the cemetery, the cost of interment, etc. This is not to say that valuing the parcel is merely a problem in multiplication. Rather, such figures as sales and costs of interment, among others, are factors which would be considered by a prospective buyer and would help to form a basis for valuing the tract before and after the condemnation."

The appellant here relies strongly, as did the condemnor in the *Buxeda* case (*supra*), upon *Laureldale Cemetery Co.* v. *Reading Co.* (303 Pa. 315). We find the reasoning of the *Buxeda* case more persuasive and the facts more nearly parallel to those here involved. The Laureldale cemetery was but three years old, as against the 85-year age and proven experience over that period of respondent St. Agnes Cemetery. But 1,200 lots had been sold from Laureldale's 117 acres and but 417 interments had been made and the land taken was in an unused portion of the cemetery for which, so far as appears, no development was imminent. In St. Agnes Cemetery some fifty to sixty thousand interments had been made, from which may reasonably

be assumed sales of lots well in excess of 15,000. While the parcel here affected was not actually in use, it was an integral part of the cemetery, deemed by respondent to be necessary to its expansion. As was said in the *Buxeda* case (*supra*, p. 180), "The fact that there were no burials in the condemned parcel is the very reason that it has value to the defendant or any prospective purchaser for cemetery purposes". The Laureldale cemetery lands consisted of three tracts, separated by highways and a railroad and the condemnation was, in fact, for the purposes of the already existing railroad. Here a complete development was definitely planned, the designs and plans prepared and a contract for development and sale of the lots executed. The projected development included some part of the older portion of the cemetery as well and had progressed so far beyond the planning stage that the fourth shrine area developed was immediately adjacent to the parcel which both parties, by the evidence adduced, treated as the area affected by the appropriation.

We conclude that the principles stated in the opinion in the *Buxeda* case (*supra*) were properly applied by the trial court in this case. Therefore, it was proper to receive evidence of the sales prices of lots in respondent's and other cemeteries, as well as evidence of respondent's experience as respected costs of development, maintenance and perpetual care and expert testimony upon those factors generally. Such evidence was obviously essential to enable the trial court to determine the market value, for cemetery purposes, of the property before the taking and thereafter.

Upon determining, as incidental to market value, the reasonable value of the lands for sale as burial lots, after giving effect to the costs of development, sale, maintenance and perpetual care, it became necessary to discount the net value thus arrived at, according to such period of years as would be required to dispose of all lots. As appears from the decision, the trial court accomplished this result, and correctly in our view, on the basis of future periodic payments, on an annual basis, over the economic life of the entire cemetery, being the period necessary for the disposition of all lots and found to be 40 years, and on the assumption of an investment return of 2% per annum, which was the rate assumed by both parties.

Respondent's proof of value on a sepulture basis included expert opinion testimony and proof of its own records and experience embracing sales and costs. The average gross sales price was shown to be $350 per lot and the net to respondent the sum of $147.50, after deductions for development costs,

for perpetual care and (as to one half of the lots) for fees contracted to be paid the cemetery development corporation.

Without departing from its contention as to the acreage theory or conceding the soundness of that asserted by respondent, the State offered alternative proof under respondent's theory. The State's experts arrived at a net value of $57.50 per lot. They accepted the respondent's average sale price of $350 gross, the fee of the development corporation and the development cost and were thus completely in agreement with respondent's experts except as to the item for perpetual care, fixed by respondent's witnesses as 20% or an average of $70 per lot. Instead, the State's experts used the figure $160 for perpetual care, solely on the basis of testimony that in the older monument-type portion of respondent's cemetery the owners of lots for which perpetual care had not been purchased were charged $4 per lot per year and the $160 figure was arrived at as that necessary to produce $4 per annum at 2½% interest. The basis for this testimony was insufficient, as not predicated upon the knowledge or experience of the witness or on the experience or practice of cemeteries generally. There was proof that the cost of upkeep of the garden type of cemetery is substantially less than that of the monument type, which is at least one reason for adoption of the garden type. Further, respondent's cemetery expert's testimony that the allowance of 20% for perpetual care was adequate and that the deduction was less in a majority of the cemeteries within his experience, was uncontradicted by any competent proof.

The trial court found the 20% deduction for perpetual care adequate, and since the parties were in substantial accord as to all other figures bearing on the lots, except as to the number of lots consequentially damaged, the determination of the value per lot, as a preliminary to the determination of market value, was made within a comparatively narrow range. The 13.939-acre parcel would accommodate approximately 2,912 lots, each containing four burial spaces, as to which there was little variance in the parties' proof. The parties differed, however, as to the number of potential lots damaged. The findings that the area southerly of the appropriated parcel was rendered valueless and that certain lots northerly of it were depreciated by one third are supported by the evidence and the trial court's determination was doubtless aided by its inspection of the premises, made pursuant to subdivision 4 of section.12 of the Court of Claims Act. There is ample support in the evidence for the trial court's finding that the economic life of the cemetery was 40 years, over which period payments for the remaining

lots would normally be received, at approximately regular intervals, so that the market value of the property, giving consideration to its advantageous use for cemetery purposes, was necessarily discounted accordingly. The resulting determinations of $265,000 as the value before the appropriation and of $56,000 after it are sustained by the preponderance of the evidence.

The judgment should be affirmed, with costs.

FOSTER, P. J., COON, HALPERN and ZELLER, JJ., concur.

Judgment affirmed, with costs.