COMMONWEALTH of Pennsylvania, DEPARTMENT OF GENERAL SERVICES, Pennsylvania Department of Transportation, Pennsylvania Public Utility Commission, Pennsylvania Emergency Management Agency, and Pennsylvania Department of State, Plaintiffs,

v.

UNITED STATES MINERAL PRODUCTS COMPANY, Certainteed Corporation, Courtaulds Aerospace, Inc., Chemrex, Inc., Philips Electronics North America Corporation, Advance Transformer Company, and Monsanto Company, Defendants.

Commonwealth of Pennsylvania, Department of General Services, Pennsylvania Department of Transportation, Pennsylvania Public Utility Commission, Pennsylvania Emergency Management Agency, and Pennsylvania Department of State, Plaintiffs,

v.

United States Mineral Products Company, Defendant.

Commonwealth Court of Pennsylvania.

Decided Oct. 16, 2002.
Publication Ordered Nov. 1, 2002.

Thomas W. Henderson, Pittsburgh and Kenneth B. McClain, Independence, MO, for plaintiffs.

Thomas M. Goutman, Philadelphia, for defendant, Monsanto Company.

Kenneth R. Neal, Hartford, CT, for defendant, U.S. Mineral Products Co.

Joyce S. Meyers, Philadelphia, for defendant, Courtaulds Aerospace, Inc.

OPINION BY Senior Judge MIRARCHI.

In August, 1990, the Department of General Services commenced an action against United States Mineral Products Company (U.S. Mineral) for damages arising out of alleged asbestos contamination of the Transportation and Safety Building (T & S Building) in Harrisburg.[1] In February, 1996, the Department of General Services and the Department of Transportation, along with the Public Utility Commission, the Emergency Management Agency and the Department of State (collectively, Plaintiffs) commenced a new action against U.S. Mineral seeking damages for alleged contamination of the T & S Building by polychlorinated biphenyls (PCBs). On February 7, 1997, Plaintiffs filed an amended complaint naming six additional defendants, Certainteed Corporation, Courtaulds Aerospace, Incorporated, Chemrex, Incorporated, Philips Electronics North America Corporation,

___

1. In August 1993, the Department of Transportation joined the action as a plaintiff.

Advance Transformer Company, and Monsanto Company.

All parties filed motions for summary judgment. This Court granted the motions of Chemrex, Incorporated and Philips Electronics North America Corporation, Advance Transformer Company. The case then proceeded to trial. During the trial, the parties presented the testimony of numerous expert witnesses and numerous exhibits. At the conclusion of the trial, the jury found that U.S. Mineral's and Courtaulds' products were not defective, and that Monsanto's product was defective and was a substantial factor in causing Plaintiffs' damages. The jury assessed damages against Monsanto in the amount of $90 million. The amount of the verdict was subsequently reduced to $45 million to reflect the automatic, pro rata, 50% reduction that Plaintiffs agreed to in a Joint Tortfeasor Release and Settlement Agreement that it had entered into with CertainTeed Corporation. Following the verdict, Monsanto filed a motion for post-trial relief.

In its motion, Monsanto raises numerous allegations of error which allegations can be categorized as follows: causation and damages; product defect issues; joinder issues; privilege claims; mistrial issues; trial issues; jury instructions; and excessive and exorbitant verdict. We shall address each category of issues seriatim.

## Causation

Monsanto first contends that Plaintiffs failed to prove a causal connection between the presence of trace amounts of PCBs in the Building and their damage claims. With regard to this issue, Monsanto makes the following specific arguments: (1) Pennsylvania Law requires Plaintiffs to prove that the presence of PCBs in the Building was the "but for" and proximate cause of their claimed damages; (2) Plaintiffs' failure to offer expert testimony of key causa-

tion issues requires entry of judgment for Monsanto; (3) the undisputed evidence demonstrates that Plaintiffs would have incurred the alleged building-related property damage, regardless of PCBs; and (4) Plaintiffs' multiple judicial admissions established that Plaintiffs' damages resulted from the need for asbestos removal.

▬ Section 402A of the Restatement (Second) of Torts has been adopted as the law of this Commonwealth applicable to product liability cases. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). To recover under Section 402A, a plaintiff must establish that the product was defective, that the defect was a proximate cause of the plaintiff's injuries, and that the defect causing the injury existed at the time the product left the seller's hands. *Davis v. Berwind Corp.*, 547 Pa. 260, 690 A.2d 186 (1997).

▬ Causation involves two separate and distinct concepts, cause in fact and legal (or proximate) cause. *Summers v. Giant Food Stores, Inc.*, 743 A.2d 498 (Pa.Super.1999), *petition for allowance of appeal denied*, 564 Pa. 713, 764 A.2d 1071 (2001). Cause in fact or "but for" causation provides that if the harmful result would not have come about but for the negligent conduct, then there is a direct causal connection between the negligence and the injury. *First v. Zem Zem Temple*, 454 Pa.Super. 548, 686 A.2d 18 (1996), *petition for allowance of appeal denied*, 549 Pa. 701, 700 A.2d 441 (1997). Legal or proximate causation, on the other hand, involves a determination that the nexus between the wrongful acts (or omissions) and the injury sustained is of such a nature that it is socially and economically desirable to hold the wrongdoer liable. *Id.* Proximate cause exists where a defendant's wrongful conduct is a substantial factor in bringing about plaintiff's harm.

*Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643 (Pa.Super.2002). Under the law of Pennsylvania, a cause can be found to be substantial so long as it is significant or recognizable; it need not be quantified as considerable or large. *Jeter v. Owens–Corning Fiberglas Corp.,* 716 A.2d 633 (Pa.Super.1998).

■ Causation is a question of fact to be determined by the fact finder. *Ford v. Jeffries,* 474 Pa. 588, 379 A.2d 111 (1977). Only if the facts are not in dispute and thus reasonable minds cannot differ can the question be removed from the consideration of the fact finder, since then there is only a question of law to be decided. *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978).

■ At trial, Plaintiffs presented the testimony of Gary Crowell, the Secretary of the Department of General Services. Secretary Crowell testified that he made the decision to demolish the T & S Building. Secretary Crowell testified that his decision was based primarily on "the amount of contamination that was in that building, the risk that I thought it posed for the people who occupied that building, the people of the private sector who came in to do business in that building." Notes of Testimony (N.T.), June 1, 1999, p. 14. Secretary Crowell testified that the T & S Building would not have been torn down based solely upon the presence of asbestos. N.T., June 3, 1999, p. 85.

Joseph Cocciardi, a contractor who performed safety and environmental work at the T & S Building, testified that PCBs were discovered in the T & S Building approximately two weeks after the fire.

Cocciardi testified that PCBs were found "in the common plenum areas ... pretty much throughout the building." N.T., May 24, 1999, p. 161. Cocciardi also testified that PCBs were subsequently found in floor troughs and inside some computers, N.T., May 24, 1999, p. 168, in a stairwell, *Id.* at 200, in an elevator, *Id.* at 203, and in routinely occupied areas of the building, *Id.* at 210. He also testified that "we were finding PCBs above the one microgram hundred squared centimeters level that NIOSH[2] was recommending to us as a cleanup level." N.T., May 24, 1999, p. 161.

William Ewing, an industrial hygienist, testified that there was widespread PCB contamination in the T & S Building and that the concentration of PCBs on surfaces within the building exceeded the EPA limits and the NIOSH recommended limits. N.T., May 20, 1999, p. 303. Ewing also testified that the ductwork in the T & S Building represented the largest source of PCBs in the building. *Id.* at 315. James Melius, a physician and epidemiologist, testified that, had the T & S Building not been appropriately cleaned, it would not have been safe for people to go back into the building and that there would have been an increased risk to their health. N.T., May 17, 1999, p. 147. Richard Lemen, an epidemiologist, testified that a building with concentrations of PCBs exceeding the NIOSH recommendation would place individuals in the building at risk for developing certain health problems. N.T., May 26, 1999, p. 156.

Based on the above testimony, a jury could reasonably conclude that the presence of PCBs in the T & S Building was

---

**2.** National Institute for Occupational Safety and Health. NIOSH is part of the Centers for Disease Control and was established as a sister agency to the Occupational Safety and Health Administration (OSHA). N.T., May 17, 1999, p. 27. NIOSH is charged mainly with conducting research on occupational safety and health issues, identifying what causes occupational illnesses and injuries, and identifying ways to prevent those illnesses and injuries from occurring. *Id.* at 27–28.

both the cause in fact and the proximate cause of Plaintiffs' claimed damages.

■ Monsanto argues that Plaintiffs were required to present expert testimony to support a finding that PCBs could not be cleaned up and the building safely reoccupied, that PCBs required the demolition and reconstruction of the building and that PCBs permanently damaged the building beyond repair. In *Young v. Department of Transportation*, 560 Pa. 373, 744 A.2d 1276 (2000), our Supreme Court addressed the issue of when expert testimony is needed.

> Expert testimony is often employed to help jurors understand issues and evidence which is outside of the average juror's normal realm of experience. We have stated that,
>
>> [t]he employment of testimony of an expert rises from necessity, a necessity born of the fact that the subject matter of the inquiry is one involving special skill and training beyond the ken of the ordinary layman.
>
> *Reardon v. Meehan*, 424 Pa. 460, [465], 227 A.2d 667, 670 (1967). Conversely,
>
>> [I]f all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as are witnesses possessed of special training, experience or observation, then there is no need for the testimony of an expert.

*Young*, 560 Pa. at 376–77, 744 A.2d at 1278.

In his testimony, Cocciardi discussed areas of the T & S Building in which PCBs were discovered and the testing which his company performed. Cocciardi testified that after PCBs were discovered in a passenger elevator, efforts were made to clean it. However, the elevator "continued to exhibit PCB levels greater than one microgram per hundred centimeters squared." N.T., May 24, 1999, p. 205. Cocciardi testified that this attempt to clean the elevator led him to believe that "cleaning would be, at least, a difficult process...." *Id.*

Secretary Crowell testified that Cocciardi told him that there were PCBs on every floor of the building and that there were also "hot spots," which contained a heavier concentration of PCBs. N.T., June 1, 1999, p. 54. Secretary Crowell discussed the difficulty of cleaning the building.

> The PCB situation, again, with the testing that's going on and finding PCBs here today, cleaning those PCBs up and then continually testing, and then you could find the hot spot here, there, anywhere or it could occur where you thought you had cleaned it. So it was kind of an unpredictable thing.

*Id.* at 75. Secretary Crowell also testified that he was concerned about getting the level of PCBs in the T & S Building down to the NIOSH recommendation. He stated:

> Well, when I talked to Mr. Cocciardi and I formed the opinion that we had a difficult time getting down to that standard, the NIOSH standard, it would—I remember it would come up. We would find the contaminants and clean it in the same kind of process that we're going through, and, again, can you get it clean. Can you ever get it down to that level and assure yourself it's going to be clean? I didn't get a sense with this experience and with the contaminants in the building that that bothered me. Am I going to end up bring[ing] people back into a building and tell them it's clean and it's not clean and then I'm concerned about their health and their wellbeing.

N.T., June 3, 1999, pp. 152–53. Secretary Crowell also discussed the effect of PCBs in the troughs under the floors:

> Well, they had high concentrations of PCBs and they had asbestos in there, and my understanding was that the way the condition was it would be extremely difficult to clean. It's better to—I think the word was seal—seal them off and not use them and let that stuff be.

*Id.* at 156.

The testimony of Cocciardi and Secretary Crowell is sufficient to describe to the jury the presence of PCBs within the T & S Building and the difficulty of eliminating the PCBs. Because the jury was capable of comprehending and understanding their testimony, there was no need for the testimony of an expert.

Monsanto also argues that the evidence demonstrated that Plaintiffs would have incurred building-related property damage, regardless of PCBs. Monsanto contends that Plaintiffs would have incurred these damages when asbestos was removed from the building and when sprinklers were installed. A defendant is not relieved from liability because another concurring cause is also responsible for producing injury. *Powell v. Drumheller,* 653 A.2d 619, 539 Pa. 484 (1995). Where a jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm, the fact that there is a concurring cause does not relieve the defendant of liability. *Id.* In *Jones v. Montefiore Hospital,* 494 Pa. 410, 416, 431 A.2d 920, 923 (1981), our Supreme Court held that:

> Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff. Pennsylvania law has long recognized

that this substantial factor need not be . . . the only factor. . . .

Based on the testimony presented at trial, the jury could have reasonably concluded that the presence of the PCBs in the T & S Building was a substantial factor in causing Plaintiffs' damages, notwithstanding Plaintiffs' stated intention to remove the asbestos and install sprinklers.

**Damages**

Monsanto makes the following specific allegations of error with regard to the issue of damages: (1) Under Pennsylvania law, Plaintiffs are not entitled to recover either the cost of constructing a new building, or the cost of abating and demolishing the T & S Building; (2) under Pennsylvania law, Plaintiffs are not entitled to recover repair costs for stripping the T & S Building down to the steel superstructure and radically reconstructing it; (3) the Court should enter judgment for Monsanto on Plaintiffs' claims for replacement and repair costs for chattels; (4) judgment should be entered for Monsanto on Plaintiffs' claim for relocation costs; (5) the Court erred in admitting evidence and permitting opinion testimony of Plaintiffs' expert Jack Halliwell; and (6) the Court erred in admitting hearsay and opinion evidence through Plaintiffs' lay witness Secretary of the Department of General Services Gary Crowell and other Commonwealth employees concerning causation and damage issues.

Monsanto first argues that Plaintiffs are not entitled to recover the replacement cost of the T & S Building. With regard to this issue, Monsanto makes the following specific arguments: (1) the appropriate measure of property damages is the lesser of diminished market value or repair cost, (2) replacement cost is an improper measure of damages for an office building; (3) the T & S Building had an ascertainable market value in the Harrisburg office

building marketplace; and (4) building replacement costs are not an appropriate measure of damages because PCBs did not damage the building beyond repair.

■ Where injury to the property is deemed to be permanent, the measure of the damages becomes the decrease in the fair market value of the property. *Richards v. Sun Pipe Line Co.*, 431 Pa.Super. 429, 636 A.2d 1162 (1994). In *Department of Transportation v. Estate of Crea*, 92 Pa.Cmwlth. 242, 483 A.2d 996 (1977), this Court created an exception to the general rule regarding the measure of damages. In *Crea*, a motorist negligently drove his automobile into the superstructure of a bridge, causing it to collapse. On appeal, this Court held that the proper measure of the Department's damages was the reasonable cost of replacement by a similar structure consistent with the current standards of design. The Court noted that "[t]he fundamental purpose of damages for an injury to or destruction of property by the tortious conduct of another is to compensate the injured party for the actual loss suffered." *Id.* at 250, 483 A.2d 996. The Court went on to state:

> [A]s value in the commercial sense is determined by the market demand for the thing valued, *Sechrist v. Bowman*, 307 Pa. 301, 161 A. 332 (1932), the application of such a damage formula to property in the public domain, such as a bridge forming a part of a highway system, cannot possibly fulfill its purpose of compensating the injured party for the actual loss sustained. The 'value' of such a bridge regardless of its age, condition and other circumstances cannot possibly be determined for want of any such value in the market place. Any attempt to so value it would be wholly speculative, the very pitfall to be avoided in proof of damages.

*Id.* at 1001. The Court went on to state that, under the facts of the case, the proper measure of damages was the reasonable cost of replacement by a similar structure consistent with current standards of design. "Anything less would not compensate the owner for the actual loss." *Id.* at 253, 483 A.2d 996.

■ Monsanto contends that the holding of *Crea* should be confined to the facts of that case and is not applicable to the matter before us. Monsanto contends that the T & S Building had an ascertainable market value in the Harrisburg commercial real estate market and that Plaintiffs failed to prove that the T & S Building does not have value in a commercial sense. Plaintiffs presented testimony at trial to establish that the T & S Building was part of the capitol complex and that legislative approval would be required before the T & S Building could be sold. The evidence presented was sufficient for the jury to find that the T & S Building had no value in the commercial sense and that the proper measure of damages was replacement cost.

■ As an alternative to Plaintiffs' claim for building replacement, Plaintiffs also sought repair costs for stripping the T & S Building down to the steel superstructure and reconstructing it.[3] Monsanto argues that Plaintiffs may not prevail on this alternate theory because (1) it was unnecessary to disembowel and radically reconstruct the building to remediate PCBs and make it safe for reoccupancy; (2) Plaintiffs did not establish that the cost of repair is the appropriate measure of damages because they introduced no evidence of diminished market value; and (3) the uncontradicted evidence establishes that the cost

---

**3.** Pa.R.C.P. No. 1020 permits a plaintiff to plead alternative causes of action.

of repair disproportionately exceeded the diminished market value of the building.

Plaintiffs presented the testimony of Michael Bond, the manager of an environmental services group for Pennonni and Associates, who was in charge of the development of the plans and specifications for abatement of PCBs in the T & S Building. N.T., June 24, 1999, p. 164. Bond testified that the level specified in the project manual for clean-up of the T & S Building was 10 micrograms per 100 centimeters squared, or 10 parts per million. *Id.* at 217. Bond testified that this level was submitted to the Environmental Protection Agency (EPA) in a position paper. *Id.* The project manual specified the sequence of the removal of the materials from the building. *Id.*, p. 218. Among the items to be removed was the HVAC ductwork.

Plaintiffs also presented the testimony of William Halliwell on the costs associated in the clean-up of the T & S Building. Halliwell testified that the total costs of abating the T & S Building, removing the PCB materials, removing the asbestos materials, and cleaning everything that remained to the level recommended by the EPA was $18,463,117. N.T., August 10, 1999, p. 81. Halliwell later testified that cleaning the T & S Building down to a level of one, the NIOSH recommendation, would cost an additional $1.3 million. N.T., August 11, 1999, p. 119–20.

Plaintiffs also presented the testimony of William Ewing who opined that the removal of PCB containing materials was the necessary remediation response and was necessary to protect human health and the environment. N.T., May 20, 1999, pp. 316–17. The record thus contains sufficient evidence to support a finding that it was necessary to gut the T & S Building to abate the PCBs.

■ The measure of damages for injury to property is the costs of repairs where that injury is reparable unless such cost is equal to or exceeds the value of the injured property. *Kirkbride v. Lisbon Contractors, Inc.*, 385 Pa.Super. 292, 560 A.2d 809, 812 (1989), (citing *Rabe v. Shoenberger*, 213 Pa. 252, 257–258, 62 A. 854, 855 (1906) and *Wade v. S.J. Groves & Sons Co.*, 283 Pa.Super. 464, 424 A.2d 902, 911 (1981)). Where the cost of repair does exceed the value of said property, the cost of damages becomes the value of the property. *Id.*

In *Kirkbride*, the appellee argued that the landowners were permitted to elect restoration of the property only if such costs would be reasonably incurred. The appellee further argued that the costs of repair must be weighed against the diminution in value of the land and, if the repair costs significantly exceed the diminution in value, such costs are unreasonable and impermissible. The Court rejected that argument, relying on the Supreme Court decision in *Lobozzo v. Adam Eidemiller, Inc.*, 437 Pa. 360, 263 A.2d 432 (1970), which "specifically noted that, with regard to remedial damage to realty, a plaintiff may recover only the cost of repair or restoration without regard to the diminution in value of the property." *Kirkbride*, 560 A.2d at 813. In making its determination, the *Lobozzo* Court looked to the holding of *Rabe v. Shoenberger*, 213 Pa. 252, 62 A. 854 (1906), "which unequivocally held that where an injury is reparable, the damage is the cost of repair or restoration." *Id.* Under the reasoning of *Kirkbride*, Plaintiffs could recover the cost of repair without a showing of diminished market value.

Monsanto next argues that the Court should enter judgment in its favor on Plaintiffs' claims for replacement and repair costs for chattel. Monsanto contends that the proper measure for personal property is the lesser of cost of repair or

diminished market value; that Plaintiffs failed to introduce expert testimony to prove any of the three elements of a personal property damage claim; and that the evidence showed that the discarded items were not unsafe.

■ The fundamental purpose of damages for an injury to or the destruction of property by tortious conduct of another is to compensate the injured party for actual loss suffered. *Daughen v. Fox,* 372 Pa.Super. 405, 539 A.2d 858, *petition for allowance of appeal denied,* 520 Pa. 605, 553 A.2d 967 (1988). Damages for the loss of use of personal property are recoverable whether or not the property is repairable. *Kintner v. Claverack Rural Electric Co-Operative, Inc.,* 329 Pa.Super. 417, 478 A.2d 858 (1984). One claiming loss of use damages when the property is repairable must show that the method of repair and the time taken to make the repair were reasonable. *Id.* Similarly, one claiming loss of use damages when the property is not repairable must show that the method of acquiring a replacement for the property and the time taken for the replacement were reasonable. *Id.*

■ The determination of damages is a factual question to be decided by the fact-finder. *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 464 A.2d 1243 (1983). This duty of assessing damages is within the province of the fact-finder and should not be interfered with unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence. *Sehl v. Vista Linen Rental Service Inc.,* 763 A.2d 858 (Pa.Super.2001) It is the province of the jury to assess the worth of the testimony and to accept or reject the estimates given by the witnesses. *Beswick v. Maguire,* 748 A.2d 701 (Pa.Super.2000). If the verdict bears a reasonable resemblance to the proven

damages, it is not the function of the court to substitute its judgment for the jury. *Id.*

■ Although the plaintiff bears the burden of proving damages by a preponderance of the evidence, he or she is required only to provide the jury with a reasonable amount of information so as to enable the jury fairly to estimate damages without engaging in speculation. *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215 (1987). Damages need not be proved with mathematical certainty. *Id.* The uncertainty as to the amount of damages shall not hinder recovery where it is clear that damages resulted from the defendant's conduct. *Scullion v. EMECO Industries, Inc.,* 398 Pa.Super. 294, 580 A.2d 1356 (1990).

■ In support of its claims for damage to personal property, Plaintiffs presented the testimony of Joseph D'Andrea, Bonnie Cvejkus and Jacqueline Hill. D'Andrea, a senior project manager for environmental study, remediation design and clean-up for L. Robert Kimball and Associates, testified that the level of recommended cleanup for the T & S Building was set by the Department of Health. N.T., June 17, 1999, pp. 27–28. The Department of Health accepted the recommendation of NIOSH and established a level of one microgram per one hundred square centimeters. *Id.* at 29. D'Andrea testified that a statistically significant number of items was tested to determine whether a larger set of items needed to be cleaned. *Id.* at 72.

Bonnie Cvejkus testified that a decision was made to destroy soft-surface items because it would be necessary to destroy the fabric to take samples, thus making the item unrepairable. N.T., July 22, 1999, p. 224. Cvejkus testified that it was more economical to purchase new work

stations and chairs than to clean and move them.[4] *Id.* at 220. Cvejkus also testified that she took the advice of Kimball and Associates who had gathered data from furniture manufacturers. *Id.* at 225. Jacqueline Hill, the fiscal officer for the Pennsylvania Emergency Management Agency, testified that her agency used the Department of Transportation's strategy plan in deciding what the agency would take and what it would discard.

The testimony of these witnesses is sufficient to establish that personal property in the T & S Building could not be repaired. Plaintiffs' evidence of replacement costs was sufficient for the jury to fairly estimate Plaintiffs' damages.

■ Monsanto also argues that judgment should be entered in its favor on Plaintiffs' claim for relocation costs. Under *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 97, 337 A.2d 893, 900 (1975), "once the negligence or defective product is shown, the actor is responsible for all the unforeseen consequences thereof no matter how remote, which follow in a natural sequence of events." Evidence presented at trial established the need to relocate employees during repair and/or replacement of the T & S Building. Plaintiffs presented evidence of the lease costs for the various buildings used for the relocation of the employees. The evidence was sufficient for the jury to fairly calculate Plaintiffs' damages with regard to relocation costs.

Monsanto next argues that Jack Halliwell was unqualified to render opinions about PCBs or PCB abatement. The Court permitted Halliwell to testify as an expert witness on the costs of abatement of PCBs from the T & S Building. Mon-

santo contends that because Halliwell never personally designed or implemented a PCB abatement program, he was not qualified to render opinions about PCBs or PCB abatement.

■ Our Supreme Court summarized the law regarding the qualification of expert witnesses in *Miller v. Brass Rail Tavern*, 541 Pa. 474, 480–81, 664 A.2d 525 528 (1995), as follows:

> It is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness had any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.... It is also well established that a witness may be qualified to render an expert opinion based on training and experience.... Formal education on the subject matter of the testimony is not required.... It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field ... only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience. (Citations omitted.)

A determination of whether a witness has been properly qualified to give expert testimony is vested in the discretion of the trial court. *West Philadelphia Therapy Center v. Erie Insurance Group*, 751 A.2d 1166 (Pa.Super.2000).

■ Halliwell is a professional engineer, registered in this Commonwealth.

4. Cvejkus testified that over 1000 work stations were discarded. *Id.* at 225. She testified that the oldest work station was approximately 11 years old, that they were high quality when they were bought, and that they were still high quality when they were discarded. *Id.*

He testified that the primary focus of his firm is the decontamination, abatement and clean-up of large and complex buildings, and the reconstruction of those buildings following the abatement process. N.T., June 29, 1999, p. 12. He testified that he has had experience in handling abatement of PCBs and has been involved in a number of PCB clean-ups. *Id.* at 23–24. He also testified that he is acquainted with the regulations and methods by which PCBs are abated from buildings. *Id.* at 26. Halliwell testified that he gained knowledge to perform his work on PCB projects through reading the specifications that had been provided to him by the hazardous waste contractors that his company had engaged for the removal and remediation of PCB light ballasts and through discussions with them. *Id.* at 115, 123. He further testified that he began learning about PCBs in 1989. *Id.* at 117. He also testified that he studied the specifications that were provided to him by the hazardous waste contractors to make a determination as to the types of project requirements his company should place on the contract, and the types of disposal requirements that would be required in the future on that type of project. *Id.* at 118.

Halliwell's testimony demonstrates that he possesses more knowledge about the clean-up of PCBs than the ordinary lay person. Given Pennsylvania's liberal standard for the qualification of expert witnesses, the Court did not err in allowing Halliwell to testify as an expert witness.

■ Monsanto next argues that the Court erred in admitting hearsay and opinion evidence of DGS Secretary Gary Crowell concerning causation and damage issues. Crowell testified that he made the decision to demolish the T & S Building. He was permitted to testify regarding the reasons for that decision. The opinion of a lay witness is admissible so long as it is based on his perception of that which he observes and would be helpful in clarifying ultimate fact for the trier. *Watson v. American Home Assurance Co.,* 454 Pa.Super. 293, 685 A.2d 194 (1996).

### Product Defect Issues

Monsanto next argues that Plaintiffs have failed to present evidence sufficient to permit recovery on a product defect theory under Section 401A of the Restatement (Second) of Torts. Specifically, Monsanto argues that (1) the fire at the T & S Building was not an intended use of any Monsanto product; (2) Plaintiffs failed to prove that any intended use of Monsanto's product caused the T & S Building to be unsafe; (3) the presence of trace amounts of PCBs did not make the T & S Building unsafe for occupancy.

■ Monsanto first argues that, under Pennsylvania law, a fire cannot constitute an intended use as a matter of law. In support of this argument, Monsanto relies upon *Pegg v. General Motors Corp.,* 258 Pa.Super. 59, 391 A.2d 1074 (1978). In that case, a plaintiff put a swimming pool chemical in a dirty paper bag and placed the bag on the floor of his car. The chemical caught fire and both plaintiffs were severely burned. The plaintiffs brought suit against General Motors, the manufacturer of the vehicle, alleging that the front seat of the car was not fire-resistant and that the plastic door lock buttons melted due to the heat of the fire thereby making escape from the burning vehicle difficult. On appeal, our Superior Court upheld the trial court's grant of a directed verdict. The Court concluded that the failure to make a seat resistant to the heat generated by the decomposition of the swimming pool chemical and the subsequent fire was not negligent because it was not reasonably foreseeable that the seat would be

exposed to such heat. The Court held that "[u]nder Section 402A, *such a fire* constituted an 'abnormal use' of the product." *Id.* at 1085 (emphasis added). We believe that the holding of *Pegg* is confined to the specific facts of that case and does not support Monsanto's argument that fire is not an intended use of a product as a matter of law. In this matter, the jury evaluated the evidence to determine whether the potential fire should be considered to be reasonably foreseeable.

■■■■ Monsanto next argues that Plaintiffs failed to prove that any intended use of Monsanto's product caused the T & S Building to be unsafe. Monsanto contends that the fire consumed PCB-containing ductboard and light ballasts and spread smoke and soot throughout the building; that had a sprinkler system been installed, the ductboard and light ballasts would not have burned and smoke and soot would not have been distributed throughout the building; and, there was no evidence that the building had unsafe levels of PCBs before the fire.

It is undisputed that PCBs were used as a plasticizer in the ductboard installed in the T & S Building. William Ewing opined that the ductboard in the T & S Building demonstrated the ability to release PCBs in vapor form and that the PCBs that were released condensed or adsorbed onto other components in the building. N.T., May 20, 1999, pp. 315–16. John Kominsky, U.S. Mineral's expert witness, testified that, during and after the installation of the ductboard, PCBs left the material through vaporization and the vapor entered the air stream of the building. N.T., November 12, 1999, p. 130. Kominsky further testified that the vaporization and adsorption of the PCBs continued over the 25 years of the T & S Building. *Id.* at 145. Joseph Cocciardi also testified that PCBs were found on samples of fireproofing material removed from the T & S Building prior to the fire. N.T., May 25, 1999, p. 51. Ewing opined that the source of the PCBs found on the samples of the fireproofing material was the ductboard. N.T., May 19, 1999, pp. 194–98. Sufficient evidence was presented from which the jury could find that PCBs were present prior to the fire, and that PCBs volatilized from the ductboard and spread throughout the building.

■■■■ Monsanto also contends that the lack of sprinklers in the T & S Building caused Plaintiffs' damages. A · superseding cause is defined as an act of a third person or other force which, by its intervention, prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about. *Hall v. Jackson,* 788 A.2d 390 (Pa.Super.2001). Additionally, a superseding cause must be an act which is so extraordinary as not to have been reasonably foreseeable. *Id.* A determination of whether an act is so extraordinary as to constitute a superseding cause is normally one to be made by the jury. *Jones v. Chieffo,* 664 A.2d 1091 (Pa.Cmwlth.1995), *aff'd,* 549 Pa. 46, 700 A.2d 417 (1997). Thus, the determination of whether Plaintiffs' failure to install sprinklers was a superseding cause which would relieve Monsanto from liability was properly made by the jury.

Next Monsanto contends that the presence of trace amounts of PCBs did not make the T & S Building unsafe for occupancy. Specifically, Monsanto argues that (1) Plaintiffs' evidence of increased risk was inadmissible and insufficient; (2) the testimony of James Melius, M.D. and Richard Lemen, Ph.D. was insufficient and inadmissible; (3) Plaintiffs' claim that PCBs volatilized from duckboard during normal building operations was based on an inadmissible litigation experiment; (4)

Plaintiffs have failed to establish product identification; (5) the Court previously held that aroclor 1242 is not unreasonably dangerous; and (6) Plaintiffs failed to establish that PCBs are unreasonably dangerous as a matter of law.

■ Monsanto first argues that Plaintiffs failed to present evidence of the magnitude of the alleged increased risk of harm to occupants of the T & S Building and failed to present evidence of the extent to which the risk was increased over baseline or background risks. Monsanto contends that Plaintiffs were required to present a statistical or epidemiological analysis of that risk. In support of that argument, Monsanto relies primarily on *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (1996). *Simmons* involved a claim for personal injuries allegedly incurred by the plaintiff as a result of working with products containing asbestos manufactured by the defendants. Plaintiffs here are not claiming damages in the nature of personal injuries. Plaintiffs' claims involve alleged damages to property.

In *Mt. Lebanon School District v. W.R. Grace*, 414 Pa.Super. 455, 607 A.2d 756 (1992), the school district sought recovery for the costs of removing asbestos products from a high school. The Court stated that recovery is appropriate where the party seeking recovery is a public entity and "the product's defect is its capacity to expose individuals to a potentially life threatening safety risk, and not in its failure to perform the function for which it was purchased." *Id.* at 763–64. Under the reasoning of *Mt. Lebanon*, PCBs may be considered defective because of their capacity to expose individuals to potentially life-threatening safety risks.

Plaintiffs' expert witness, Dr. Melius testified that animal studies have demonstrated that PCBs are carcinogenic and have caused cancer in laboratory animals.

N.T., May 17, 1999, p. 88. He also testified that exposure to PCBs cause a skin disease called chloracne, *id.* at 65–66, liver disease and changes in liver function, *id.*, malignant melanoma, *id.* at 89. Dr. Melius also testified that several studies showed elevated incidents of cancer in workers who were exposed to PCBs. *Id.* at 67. These cancers included melanoma, cancer of the liver and cancer of the digestive tract. *Id.* He further testified that PCB exposure has been associated with cancer of the gallbladder, tissue connecting the gallbladder to the intestinal system, and pancreas, stomach, colon and rectum cancer. *Id.* at 89–90. Dr. Melius further testified that exposure to PCBs has also been associated with cancer of the blood forming organs such as leukemia and lymphoma. *Id.* at 90–91. Dr. Melius also testified that PCBs promote the development of cancer and that the International Agency for Research on Cancer classified PCBs in the late 1980s as a probable carcinogen. *Id.* at 92, 96. Dr. Melius also opined that, if the T & S Building had not been appropriately cleaned, it would not have been safe for people to go back into the building and that there would have been an increased risk to their health. N.T., May 18, 1999, p. 147. This testimony is sufficient under *Mt. Lebanon* to establish that PCBs are defective due to their capacity to expose individuals to potentially life-threatening safety risks.

Monsanto next argues that the testimony of James Melius, M.D. and Richard Lemen, Ph.D. was insufficient and inadmissible. Monsanto also argues that the Court erred in denying Monsanto's motions in limine and in permitting the testimony of Melius and Lemen.

■ For expert evidence to be admissible, it must meet the standard established in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and adopted by our Su-

preme Court in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977).[5] Pursuant to *Frye*, it must be shown that there is general acceptance of the evidence's validity by those scientists active in the field to which the evidence belongs. *Tagliati v. Nationwide Insurance Co.*, 720 A.2d 1051 (Pa.Super.1998). The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. *Topa*, 471 Pa. at 232, 369 A.2d at 1282 (quoting *United States v. Addison*, 498 F.2d 741, 744 (D.C.Cir.1974)).

 There must be a showing that the existence of the causal relationship is generally accepted by the relevant scientific community. *McKenzie v. Westinghouse Electric Co.*, 674 A.2d 1167 (Pa.Cmwlth. 1996). There are two ways to analyze the question of whether causation testimony meets the *Frye/Topa* standard. *Blum v. Merrell Dow*, 705 A.2d 1314 (Pa.Super.1997), *aff'd*, 564 Pa. 3, 764 A.2d 1 (2000). One focuses on whether the causal relationship is generally accepted by the scientific community, and the other on whether the methodology is generally accepted by the scientific community. *Id.*

In *Blum*, the Superior Court summarized the role of the trial judge as follows:

The judge in considering admissibility does not decide whether the propositions or theories are true or false. Rather the judge as gatekeeper decides whether the expert is offering sufficiently reliable, solid, trustworthy science. The question is: is the science good enough to serve as the basis for the jury's findings of

fact, or is it dressed up to look good enough, but basically so untrustworthy that no finding of fact can properly be based on it. If the latter is true, the integrity of the trial process would be tainted were the jury to consider it.

*Id.* at 1322.

 In his expert report, James Melius, M.D. reached the following expert opinions to a reasonable degree of medical and scientific certainty:

The contamination of the Pennsylvania Department of Transportation Building with PCB's posed a significant health risk for building occupants. These health risks include cancer and adverse reproductive or developmental effects.

Based on these findings, the State of Pennsylvania should take steps to reduce these PCB exposures by decontamination of the building or other means.

The adoption of clean-up guidelines by the State of Pennsylvania as recommended by NIOSH was necessary to protect the health of the building occupants and their offspring. This criterion of one microgram per 100 square centimeters would provide significant protection for building occupants from the potential health risks from PCB exposures in the building. However, this criterion would not guarantee that adverse health effects would not result from continued exposure in the building.

The adoption of other, less stringent guidelines (for example, 10 micrograms per 100 square centimeters) would have

5. As a matter of federal jurisprudence, *Frye* was overruled in *Daubert v. Merrell Dow*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), on the ground that it had been superceded by the Federal Rules of Evidence. *Daubert* establishes a two-prong test to deter-

mine admissibility of scientific evidence: (1) whether the testimony will assist the trier of fact; and (2) whether the testimony will be reliable or scientifically valid. Pennsylvania courts continue to employ the *Frye* test. *See* Comment to Pa.R.E. 702.

posed an increased potential health risk for building occupants.

(Report of Dr. Melius, p. 2.)

In its motion in limine, Monsanto argued that Dr. Melius' testimony should be excluded as inadmissible because his opinions and the methodologies by which his opinions are derived, are not generally accepted. Monsanto argued that Dr. Melius' opinion that PCB levels within the Environmental Protection Agency (EPA) standard pose a significant health risk to humans is not generally accepted by the scientific community. Monsanto also argued that the NIOSH standard, published in 1977, is outdated and obsolete, and has been abandoned by NIOSH itself in favor of "risk assessment-based" recommended exposure limits. Monsanto contended that the EPA standards are followed routinely throughout the nation when cleaning up PCBs and that the PCB levels in the T & S Building, on average, complied with that standard.[6]

Monsanto further argued that Dr. Melius' methodologies are not generally accepted by the scientific community and are therefore inadmissible. Monsanto pointed to the following alleged flaws in Dr. Melius' methodology: misplaced reliance on animal studies; improper reliance on human epidemiological studies demonstrating no consistent pattern of adverse effects from PCB exposure; improper reliance on studies with no comparable doses; improper conclusions from studies where the studies' authors explicitly refused to draw those conclusions; improper reliance on NIOSH guidelines based on presumed effects on humans extrapolated from animal studies; and, improper failure to utilize quantitative risk assessment.

In his expert report, Richard A. Lemen, Ph.D. rendered the following opinions to a reasonable degree of scientific certainty concerning the PCB contamination in the T & S Building and the risk to building occupants, the appropriate guidelines to follow for decontamination, and the effectiveness of the clean up:

> That the NIOSH policy statements and the supporting new documents provide sufficient evidence to conclude that the level of contamination in the DOT building poses a significant health risk to building occupants. These risks include both cancer, reproductive effects, and other possible toxic reactions such as liver and dermal effects.

> That the OSHA standard is based on data derived from ACGIH [American Conference of Governmental Industrial Hygienists], published in 1968 and therefore does not consider much of the data analyzed by NIOSH which has occurred since 1968. Thus the NIOSH recommended air standard of a concentration of [one microgram per cubic meter] was based on newer scientific data through 1986 some of which is covered in my report and is now further supported by even newer data derived since 1986.

> That the best protection, for building occupants, are contained in the guidelines recommended by NIOSH.

Report of Dr. Lemen, pp. 12–13.

In its motion in limine, Monsanto makes essentially the same arguments in regards to Dr. Lemen's testimony as it did with Dr. Melius' testimony: that the NIOSH guidelines are outdated, that the EPA standards are the standards generally accepted by the scientific community and

---

**6.** The EPA standard is as follows:
 (a) for high contact surfaces, 10 micrograms per 100 cubic centimeters;

 (b) for low contact surfaces, 100 micrograms per 100 cubic centimeters.

that the methodology used by Dr. Lemen was flawed and not generally accepted by the scientific community.

In the absence of any official revocation of the 1977 NIOSH guideline, the Court concluded that Dr. Lemen and Dr. Melius may reasonably rely on that standard. As to the apparent conflict between EPA standards and NIOSH guideline, the Court concluded that Dr. Lemen and Dr. Melius may reasonably rely on a standard promulgated by the institute specifically authorized by Congress to "develop and establish recommended occupational safety and health standards." 29 U.S.C. § 671(c)(1).

Monsanto also pointed out that numerous experts disagree with Dr. Lemen's and Dr. Melius' opinions that the PCB levels in the T & S Building were unsafe. In *Commonwealth v. Zook*, 532 Pa. 79, 100, 615 A.2d 1, 12 (1992), our Supreme Court stated: "This Court has never held that the number of expert witnesses to testify on a given subject is dispositive; rather it is the quality of the expert's testimony which should be the focus of the trial court."

The Court denied Monsanto's motions in limine finding that, Dr. Lemen's and Dr. Melius' opinions, that the PCB levels in the T & S Building are unsafe, are based on the NIOSH guidelines, and therefore, they may reasonably rely on that standard. The Court further found that the fact that other experts may disagree with that conclusion was not a basis for excluding their testimony where their conclusions are drawn from a governmental standard.

■ Monsanto also argues that Plaintiffs' claim that PCBs volatilized from duckboard during normal building operations was based on an inadmissible litigation experiment.

On February 15, 1998, William Ewing collected samples of duct board from three locations on the 10th floor of the T & S Building and three locations on the 11th floor. At each location, a 1' × 1' section of duct board and a 4" × 4" section of duct board were collected. Split samples were provided to Defendants' representatives who observed the sampling. Three samples were chosen for off-gassing tests, consisting of placing the samples of duct board into stainless steel chambers and measuring the PCB concentrations at a known temperature and percent relative humidity. Ewing conducted the tests on April 17, 1998 at the chamber testing facilities of Air Quality Sciences, Incorporated (AQS). All analyses were conducted by Specialized Assays, Incorporated (SAI), a laboratory accredited by the American Industrial Hygiene Association. Based on the results of the tests, Ewing concluded:

> The off-gassing tests demonstrate the ability of the PCBs to release from the duct board with the application of heat such as that found in ducts downstream of the re-heat coils in the PennDOT building. The results further indicate the PCBs are released quickly as the temperature rises. The amount released then quickly drops when the temperature is held constant for a period of time.
>
> It is likely that PCBs in the form of Aroclor 1262 were released from the fiber duct boards during the initial heating season in the PennDOT building (winter). It is likely this off-gassing continued throughout the life of the building as the PCBs migrate to the surface of the fiber duct board and evaporate. The highest concentrations of PCBs released would occur during the start of the heating season, or when the fiber duct boards are subject to heat from other sources, such as fire.

Ewing Report, Section II(A), p. 10.

In his report, Ewing also provided the following conclusions, to a reasonable degree of scientific certainty:

1. The PCBs in or on the ductwork in the PennDOT building represents the largest source in the building

2. PCBs from the square fiber board ducts have the demonstrated ability to off-gas PCBs (release PCBs in vapor form), and would have continued to do so had they not been removed.

3. PCBs have released from the duct-board, ballasts and caulking and condensed or absorbed into other facility components, fixtures, furniture and materials.

4. Removal of the PCB-containing materials and porous material contaminated with PCBs is the necessary remediation response

5. Removal of the PCB-containing fluorescent light ballasts and caulk from the precast concrete panels was necessary to comply with applicable regulations and recommended practices, and to prevent further contamination from these sources.

6. Cleaning and testing was necessary to decontaminate materials removed from the building. Cleaning and testing of the building itself, to the extent feasible, was necessary prior to demolition.

7. The procedures used to remediate the PCBs from the PennDOT building were consistent with those required by regulations, recommended standards and practices, and necessary to protect human health and the environment.

Ewing Report, Section V, pp. 13–14.

At a hearing conducted on April 19, 1999, Monsanto offered the testimony of its expert, Mitchell D. Erickson, an analytical chemist. Dr. Erickson opined that Ewing's chamber tests were defective and were not scientifically valid. Dr. Erickson identified four major flaws in Ewing's testing: (1) the delineation of the experimental plan or design; (2) the failure to follow the plan; (3) insufficient quality assurance; and (4) interpretation of data.

With regard to the first area of criticism, Dr. Erickson testified that Ewing's plan is only a broad outline of the test and a lot of information was omitted. Dr. Erickson also testified that Ewing did not follow the scientific method in the design of his plan.

With regard to the execution of the experimental plan, Dr. Erickson testified that Ewing deviated from the ASTM Standard by failing to properly calibrate the testing chambers. Dr. Erickson also testified that Ewing failed to record all data, failed to take measurements at room temperature, as he had planned, failed to record measurements of the surface temperature of the fiberglass, and, exposed all six sides of the duct board in the chamber testing even though only one side of the duct board is exposed to heat during actual usage of the product.

Dr. Erickson also testified that there was no written quality control/quality assurance plan as part of Ewing's report. Dr. Erickson testified that performing a test in triplicate is not a sufficient method to validate the testing procedures. He further testified that Environmental Protection Agency (EPA) method 8081A, is not proper method to extract PCBs.

With regard to the test result Ewing reported, Dr. Erickson testified that there are no consistent results. He testified that when data from tests are graphed, the slope should be the same for all the tests. The slope is dramatically different when Ewing's results are graphed. Dr. Erickson also testified that the data Ewing reported are not consistent with the known properties of PCBs.

On cross-examination, Dr. Erickson testified that he has never tested PCB-impregnated duct board; that the ASTM

Standard [7] does not prohibit the use of heat to measure off-gassing; that small chamber testing can be a method to test for PCBs; and, that a test could be devised to measure off-gassing of PCBs, but Monsanto and CertainTeed did not ask him to do so. Dr. Erickson also acknowledged that the results of two of the three tests Ewing performed are in rough agreement and that heat sources have been used in small chambers to determine off-gassing.

Ewing testified that he had a well thought out plan for the collection of samples from the duct board in the T & S Building. In a memo dated February 4, 1998, Ewing stated his intention to visit the building on February 8, 1998 to select locations for samples. After the visit, a list of the locations was to be prepared and submitted with a request that mini-enclosures be constructed at each location. The actual sample collection would take place on February 15, 1998. In a further memo, apparently prepared on February 10, 1998, Ewing detailed his plans for the collection of the samples. His plans for the actual testing were set forth in a letter dated January 19, 1998.

Ewing testified that small chamber testing is an appropriate method to determine off-gassing of building materials and that he has performed small chamber tests prior to the tests he performed on duct board from the T & S Building. He also testified that the ASTM Standard is a guide and does not dictate how to elevate or lower temperatures. He testified that he had to devise his own heating method for testing and that AQS recommended use of a heat lamp. Ewing testified that the results of two of his tests are virtually identical. Ewing attributed the different results of

the third test to a malfunction of a temperature recording device. Ewing testified that he followed all standard techniques and that others could replicate his testing using the protocol.

On cross-examination, Ewing acknowledged that he is not an expert on the physical properties of PCBs; that he never before did small chamber testing on PCBs or PCB-containing products; and, that he never before did small chamber testing with heat. He further acknowledged that he did not have a written quality assurance plan and that he did not add calibration gas to the test chamber. However, he testified that both air and bulk samples were spiked, a method of quality control authorized by Section 6.5 of the ASTM Standard. Ewing also acknowledged that his sole validation for his testing is that he performed the test in triplicate. He stated that only two tests are needed for validation.

Ewing also testified that he was not successful in keeping humidity in the chambers at 50%, and he acknowledged that humidity could have an effect on volatility. He also acknowledged that he did not separately record the surface temperature data of the duct board because the surface temperature agreed with the air temperature in the chamber. He testified that he kept notes on Chamber No. 3, after it evidenced a deviation in temperatures from the other two chambers.

On re-direct examination, Ewing testified that the small chamber test is appropriate for testing PCBs and was designed for use for organics. He also testified that although ASTM does not require a quality control/quality assurance plan, it does have quality control/quality assurance proce-

dures. On re-cross examination, he acknowledged that he could not say at what point volatilization occurs during a range of temperatures; that his data does not prove any volatilization at any temperature below 102 degrees; and that he is the first person to perform small chamber tests on duct board for PCBs.

Following the hearing, the Court reviewed Ewing's testimony and found as follows: Prior to collecting the samples, Ewing set forth his plan for collecting and testing the samples. Ewing performed the test at a independent facility, and the analyses were conducted by an accredited laboratory. Ewing used the ASTM Standard as a guide. The ASTM Standard does not establish procedures which must be followed in small chamber testing. The ASTM Standard does not require a written quality control/quality assurance plan. Ewing kept field notes during the testing in which he listed temperature and relative humidity. The results from two of the three tests are very similar.

The Court concluded that the procedures used by Ewing were in sufficient compliance with generally accepted scientific methodology to be admissible under *Frye*. Deficiencies in his methodology go to the weight to be accorded his testimony at trial. Accordingly, the Court denied Monsanto's motion in limine seeking to preclude Ewing's testimony. The Court, having considered Monsanto's arguments in its motion for post-trial relief, reaffirms its previous ruling on the admissibility of Ewing's testimony.

■ Monsanto further argues that Plaintiffs presented no competent evidence to establish that the duct board system was ever exposed to temperatures Ewing said were necessary for measurable volatilization. Experts are permitted to express opinions based upon reports, not in evidence, provided that such reports are of a type customarily relied upon by experts in the field in making professional judgments. Pa.R.E. 703. In *Primavera v. Celotex Corp.*, 415 Pa.Super. 41, 608 A.2d 515, 519 (1992), *petition for allowance of appeal denied*, 533 Pa. 641, 622 A.2d 1374 (1993), our Superior Court explained the rationale for this exception to the hearsay rule as follows: "The expert is assumed to have the mastery to evaluate the trustworthiness of the data upon which he or she relies, both because the expert has demonstrated his expert qualifications and because the expert regularly relies on and uses similar data in the practice of his or her profession." However, an expert is not permitted to "repeat another's opinion or data without bringing to bear on it his own expertise and judgment." *Id.*

■ Ewing opined, based on his review of the ventilation system and the ventilation drawings of the building and on his experience with the type of system, that the normal air temperature within the ducts during the hearing season would be about 110 degrees Fahrenheit. N.T., May 20, 1999, p. 383. Ewing also consulted with John Buhay, refrigeration plant supervisor for the T & S Building about the temperature of the air in the ducts and other experts. Because the opinions on which Ewing relied were of a type upon which an expert would normally rely, the Court properly admitted Ewing's testimony.

Monsanto also argues that Plaintiffs failed to establish product identification. Monsanto admits that Plaintiffs identified Monsanto as the source of the PCBs contained in interior ductwork and exterior caulking that were manufactured and sold by CertainTeed and Courtaulds. Monsanto argues that Plaintiffs have not established that Monsanto manufactured the PCBs in any other product found in the T & S Building. The Court instructed the

jury that there was no evidence that Monsanto supplied PCBs to manufacturers of products other than CertainTeed and Courtaulds and that the jury may not decide the case against Monsanto based on those products.

Monsanto further argues that the Court previously held that Aroclor 1242 is not unreasonably dangerous. In support of this argument, Monsanto relies on the Court order, dated May 7, 1999, dismissing Philips Electronics and Advance Transformer from the case. The Court's order did not include a finding that Aroclor 1242 is not unreasonably dangerous, and therefore, Monsanto may not rely solely on this order to support its argument.

 Finally, Monsanto argues that Plaintiffs failed to establish that PCBs are unreasonably dangerous as a matter of law. To prevail in a products liability case, the plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm. *Riley v. Warren Manufacturing Inc.*, 455 Pa.Super. 384, 688 A.2d 221 (1997). The threshold inquiry in all products liability cases is whether there is a defect. *Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984). A design defect will be found where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use. *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978).

The evidence presented at trial established that PCBs were defective, that the defect existed at the time they left the hands of the defendant and that the defect caused Plaintiffs' harm. Thus, Plaintiffs met their burden of proof in this product liability case.

**Late Joinder**

Monsanto next argues that the Court erred in granting Plaintiffs' motion to amend their complaint, seven years after commencing suit, to name Monsanto as a defendant. Specifically, Monsanto contends that (1) it was severely prejudiced by the late joinder, and (2) allowing Plaintiffs to amend their complaint to include Monsanto effectively permitted U.S. Mineral to add Monsanto as an additional defendant without proper grounds.

Monsanto contends that it was prejudiced in the following manner: (1) Monsanto was deprived of the opportunity to conduct its own tests and investigations of the T & S Building at, or close to, the time of the fire; (2) Monsanto was deprived of the opportunity to test the T & S Building under the conditions that existed during the relevant time period to determine the environmental conditions of the building when the major building systems were still operating; and (3) Monsanto was deprived of the opportunity to participate in depositions taken by Plaintiffs and U.S. Mineral thereby allowing Plaintiffs and U.S. Mineral to create a factual record concerning PCBs that was favorable to them and prejudicial to Monsanto.

 Amendments to pleadings are liberally granted to secure a determination of cases on their merits whenever possible. *Beckner v. Copeland Corp.*, 785 A.2d 1003 (Pa.Super.2001). Leave to amend lies within the sound discretion of the trial court and the right to amend should be liberally granted at any stage of the proceedings unless there is an error of law or resulting prejudice to an adverse party. *Werner v. Zazyczny*, 681 A.2d 1331, 545 Pa. 570 (1996). Prejudice must be something more than a detriment to the other party, since any amendment almost certainly will be designed to strengthen the legal position of the amending party and

correspondingly to weaken the position of the adverse party. *Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc.,* 344 Pa.Super. 367, 496 A.2d 840, 844 (1985).

 The prejudice alleged by Monsanto does not rise to the level of reversible error. Monsanto was permitted to inspect and test the T & S Building prior to its demolition. Moreover, Monsanto had access to the testing performed by Plaintiffs and U.S. Mineral. Monsanto had an opportunity to depose Plaintiffs' witnesses and had access to any previous depositions.

### Privilege Issues

Monsanto next argues that the Court erred in granting Plaintiffs' blanket claims of privilege which resulted in a trial conducted without the benefit of critical documents addressing the claims at issue. Monsanto contends that (1) the attorney-client privilege does not protect the documents Plaintiffs sought to withhold from discovery; (2) the work product doctrine does not protect the documents Plaintiffs sought to withhold from discovery; and, (3) the documents are not protected from discovery as materials relating to retained experts.

The attorney-client privilege is codified in Section 5928 of the Judicial Code, 42 Pa.C.S. § 5928, which provides that "[i]n a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon trial by the client." The attorney-client privilege is intended to foster candid communications between legal counsel and the client so that counsel can provide legal advice based upon the most complete information possible from the client. *Commonwealth v. Chmiel,* 558 Pa.

478, 738 A.2d 406 (1999). The historical concern has been that, absent the attorney-client privilege, the client may be reluctant to fully disclose all the facts necessary to obtain informed legal advice if these facts may later be exposed to public scrutiny. *Id.*

 Application of the privilege requires confidential communications made in connection with providing legal services. *Commonwealth v. duPont,* 730 A.2d 970 (Pa.Super.1999), *petition for allowance of appeal denied,* 561 Pa. 669, 749 A.2d 466 (2000). The attorney-client privilege extends to an agent of an attorney who assists in the provision of legal advice to the client. *Commonwealth v. Noll,* 443 Pa.Super. 602, 662 A.2d 1123 (1995), *petition for allowance of appeal denied,* 543 Pa. 726, 673 A.2d 333 (1996). Government entities also qualify for the protection of the attorney-client privilege, and such entities may claim the privilege for communications between their attorney and their agents or employees who are authorized to act on behalf of the entities. *Gould v. City of Aliquippa,* 750 A.2d 934 (Pa.Cmwlth.2000).

 The "work product rule" is closely related to the attorney-client privilege but is broader because it protects any material, regardless of whether it is confidential, prepared by the attorney in anticipation of litigation. *National Railroad Passenger Corp. v. Fowler,* 788 A.2d 1053 (Pa. Cmwlth.2001). The work product doctrine, as embodied in Rule 4003.3 of the Pennsylvania Rule of Civil Procedure, Pa. R.C.P. No. 4003.3, protects from disclosure, inter alia, "mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics," including those of a party's representative who is not the party's attorney. The doctrine has been expanded to cover documents prepared for

attorneys by their agents, i.e., investigators, in anticipation of litigation. *Id.* Pursuant to Rule 4003.5(a)(3) of the Pennsylvania Rules of Civil Procedure, Pa. R.C.P. No. 4003.5(a)(3), "[a] party may not discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial...."

■ Moreover, even assuming that the Court erred in upholding Plaintiffs' claims of privilege, a situation we are not conceding, such error would not warrant the grant of a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake. *Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000). Monsanto has not established how it was prejudiced by any improper ruling on the privilege issue. Monsanto was able to present a defense to Plaintiffs' claims, cross-examine Plaintiffs' witness, and present witnesses of its own. Accordingly, a new trial is not warranted.

### Mistrial Issues

Monsanto next argues that the Court erred (1) in failing to grant a mistrial based upon the collusive settlement and cooperation agreement between Plaintiffs and U.S. Mineral which was wrongfully concealed from Monsanto until Plaintiffs' case was closed and the damage was irrevocable; (2) in failing to grant the motion for mistrial due to ineligible juror; (3) in not granting a mistrial after Plaintiffs twice put before the jury highly inflammatory material that the Court had precluded pretrial; and, (4) by instructing the jury to resume deliberations after the jury complained of "stress" on the ninth day because it had been stalemated for four days on one issue, the Court effectively coerced the verdict that immediately followed.

■ In order to obtain a new trial, the moving party must demonstrate in what way the claimed trial error caused an incorrect result. *Clack v. Department of Transportation,* 710 A.2d 148 (Pa.Cmwlth. 1998). In ruling on a motion for a new trial, the court must view all the evidence, *Abbott v. Steel City Piping Co.,* 437 Pa. 412, 263 A.2d 881 (1970), and if the trial court concludes that the judicial process has effected a serious injustice, only then should it grant a new trial. *Smith v. Barker,* 368 Pa.Super. 472, 534 A.2d 533 (1987). A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion. *Andrews v. Jackson,* 800 A.2d 959 (Pa.Super.2002).

Monsanto first argues that the Court erred in failing to grant a mistrial based on the settlement agreement entered into by Plaintiffs and U.S. Mineral. The settlement agreement provided that U.S. Mineral would make cash payment to Plaintiffs, totaling $1,000,000 by August 10, 1999. The agreement also provided that in the event that U.S. Mineral was found liable to Plaintiffs, its liability would be capped at $3,000,000; that U.S. Mineral would continue to defend itself at trial; and, that U.S. Mineral would make its expert witness, John Kominsky, available to testify.

■ Under *Hatfield v. Continental Imports, Inc.,* 530 Pa. 551, 610 A.2d 446, (1992), where an agreement allies two or more parties against another, such that a clear potential for bias exists which would not otherwise be apparent to the factfinder, that part of the agreement, or at least the existence of the reason for the poten-

tial bias, must be conveyed to the factfinder. The settlement agreement, with two minor redactions, was read to the jury on November 10, 1999. The Court also offered Monsanto the opportunity to recall any of Plaintiffs' witnesses so that he or she could be re-examined with reference to the settlement agreement. The disclosure of the agreement to the jury and the opportunity afforded to Monsanto to recall any witness for further cross-examination remedied any prejudice Monsanto incurred as a result of the settlement agreement.

Monsanto next argues that the Court erred in failing to grant a mistrial due to an ineligible juror.[8] Monsanto argues that in this situation, prejudice is presumed and a new trial is mandated. In support of its argument, Monsanto relies primarily on *Commonwealth v. Kelly*, 415 Pa.Super. 248, 609 A.2d 175, *petition for allowance of appeal denied*, 533 Pa. 598, 617 A.2d 1272 (1992) and *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972).

■ The cases on which Monsanto relies on involve criminal trials. We do not believe such a strict standard should apply to civil matters. The juror in question did not participate in jury deliberations and the Court repeatedly reminded the jurors, throughout the course of the trial, that they were not to discuss the trial with the other jurors or with anyone else. Further, there was no allegation that the juror in question had any relationship with any party in the case. Under these circumstances, we believe that dismissal of the juror was an adequate remedy after she revealed her criminal conviction.

■ Monsanto next argues that the Court erred in not granting a mistrial after Plaintiffs twice put before the jury highly inflammatory material that the Court had precluded pretrial. Whether remarks by counsel warrant a new trial requires a determination based upon an assessment of the circumstances under which the statements were made and the precaution taken by the court and counsel to prevent such remarks from having a prejudicial effect. *Young v. Washington Hospital*, 761 A.2d 559 (Pa.Super.2000). It is the duty of the trial judge to take affirmative steps to attempt to cure harm, once an offensive remark has been objected to. *Siegal v. Stefanyszyn*, 718 A.2d 1274, 1277 (Pa.Super.1998), *petition for allowance of appeal denied*, 559 Pa. 693, 739 A.2d 1059 (1999).

■ On November 23, 1999, Plaintiffs cross-examined a Monsanto witness by referencing a document that the Court had precluded pre-trial. The Court instructed the jury to ignore the previous questions which related to that document. On February 10, 2000, Plaintiffs placed an enlarged version of a passage in that document on a screen in front of the jury. The Court sustained Monsanto's objection. The Court took appropriate action after these incidents and a mistrial was not warranted.

■ Monsanto next argues that the Court effectively coerced the verdict after instructing the jury to resume deliberations after the jury complained of stress on the ninth day of deliberations. It is well-settled law that the amount of time that a jury is kept together to deliberate is a matter within the discretion of the trial judge, whose decision will only be reversed for an abuse of discretion or evidence that the verdict was the product of coercion of an overworked or fatigued jury. *Com-*

---

**8.** On February 29, 2000, a juror revealed that she was a convicted felon and she was dismissed from the jury.

*monwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859 (2000). In determining whether the trial court abused its discretion, consideration should be given to the charges at issue, the complexity of the issues, the amount of testimony to consider, the length of the trial, the solemnity of the proceedings and indications from the jury on the possibility of reaching a verdict. *Commonwealth v. Johnson,* 542 Pa. 384, 668 A.2d 97 (1995).

■ Based on the length of the trial, the complexity of the matter under consideration, the amount of testimony to consider and the fact that the jury did not indicate that it was hopelessly deadlocked, the Court did not abuse its discretion in sending the jury back for further deliberations.[9]

### Trial Issues

Monsanto next argues that the Court made numerous errors during the course of the trial. Specifically, Monsanto argues that the Court erred (1) in permitting U.S. Mineral to cross-examine Plaintiffs' witnesses about PCBs despite the absence of adversity; (2) in permitting expert witness John Kominsky to testify beyond the scope of his pretrial report; (3) in restricting Monsanto's cross-examination of Plaintiffs' witnesses; (4) in allowing Plaintiffs to examine Monsanto's expert witnesses far beyond the permissible bounds of cross-examination; (5) in admitting the deposition testimony of former Monsanto employees William B. Papageorge and George J. Levinskas; (6) in permitting Plaintiffs to admit rebuttal evidence through the testimony of the Department of Transportation employee Bonnie Cvejkus; (7) in refusing to grant Monsanto four peremptory challenges; (8) in prohibiting the use and barring admission of illustrative exhibits ex-

plaining complicated toxological concepts addressed by Robert James, Ph.D.; and, (9) in excluding evidence that Plaintiffs mistakenly waived tens of million of dollars in fire insurance coverage.

The admission or exclusion of evidence is within the sound discretion of the trial court. *Bennyhoff v. Pappert,* 790 A.2d 313 (Pa.Super.2001). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Ettinger v. Triangle–Pacific Corp.,* 799 A.2d 95 (Pa.Super.2002). Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment. *Bryant v. Reddy,* 793 A.2d 926 (Pa.Super.2002).

■ Monsanto first argues that U.S. Mineral was not adverse to Plaintiffs and that U.S. Mineral's cross-examination of witnesses amounted to a second direct examination, designed not to discredit the witnesses but to bolster the witnesses' testimony against Monsanto. Monsanto cites U.S. Mineral's cross-examination of James Melius, Jack Halliwell, William Ewing, Joseph Cocciardi and Bonnie Cvejkus. The cross-examinations of Melius, Ewing, Cocciardi and Cvejkus occurred, however, prior to July 7, 1999, the date that U.S. Mineral and Plaintiffs executed the settlement agreement.

Under the terms of the settlement agreement, U.S. Mineral agreed to pay Plaintiffs a total of $1,000,000 by August 10, 1999. However, in the event that U.S. Mineral was found liable by the jury, U.S. Mineral could be liable for an additional $2,000,000. The execution of the settlement agreement may have reduced, but did not extinguish, the adversity between U.S. Mineral and Plaintiffs.

---

**9.** The Court also notes that the jury was not sequestered during deliberations.

Under Rule 611 of the Pennsylvania Rules of Evidence, Pa. R.Evid. 611, a "party witness in a civil case may be cross-examined by an adverse party on any matter relevant to any issue in the case, including credibility...." Because the interests of U.S. Mineral remained adverse to those of Plaintiffs, U.S. Mineral could properly cross-examine any witness on any matter relevant to any issue in the case.

Monsanto next argues that the Court erred in permitting John Kominsky to testify beyond the scope of his expert report. Discovery of information concerning expert testimony is governed by Pa. R.C.P. No. 4003.5, which provides in pertinent part:

(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings ... the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the ... separate report, or supplement thereto.

■ The question of whether the permissible limits of testimony under the Rule have been violated is to be determined on a case by case basis, and the essence of the inquiry is fairness. *Burton–Lister v. Siegel, Sivitz & Lebed Associates*, 798 A.2d 231 (Pa.Super.2002). The question is whether the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response. *Corrado v. Thomas Jefferson University Hospital*, 790 A.2d 1022 (Pa.Super.2001). The opposing party must be prejudiced as a result of the testimony going beyond the fair scope of the expert's report before admission of the testimony is considered reversible error.

*Coffey v. Minwax Co.*, 764 A.2d 616 (Pa.Super.2000).

■ Monsanto has not established prejudice as a result of any testimony which it contends exceeded the scope of Kominsky's report. The Court permitted Monsanto's witness, John Woodyard, to supplement his expert report to address Kominsky's testimony that PCBs primarily vaporized during the installation of the duct board and to offer testimony at trial based on his supplemental report.

Monsanto next argues that the Court erred in restricting Monsanto's cross-examination of Plaintiffs' witnesses. Monsanto contends that it was unfairly restricted in cross-examining Secretary Crowell, Deputy Secretary Merle Ryan, Charles Bowser and Joseph Cocciardi

■ The scope of cross-examination includes the right to examine the witness on any facts tending to refute inferences or deductions arising from the testimony of a witness on direct examination, thereby affecting his or her credibility. *Chicchi v. Southeastern Pennsylvania Transportation Authority*, 727 A.2d 604 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 560 Pa. 750, 747 A.2d 371 (1999). The scope and limits of cross-examination are within the trial court's sound discretion, and the exercise of that discretion will not be reversed in the absence of a clear abuse of discretion or an error of law. *Id.* The Court did not abuse its discretion in not permitting Monsanto to cross-examine witnesses on documents which they did not recognize, on matters the Court considered collateral, and on a document the Court considered a settlement agreement.

Monsanto next argues that the Court erred in allowing Plaintiffs to examine Monsanto's expert witnesses (1) regarding hearsay statements in various publications upon which they did not rely and which

were not considered authoritative, (2) regarding chemicals other than PCBs, and (3) exceeding the bounds of their direct examination, reports and proffered areas of expertise.

■ An expert witness may be cross-examined on the contents of a publication upon which he or she has relied in forming an opinion, and also with respect to any other publication which the expert acknowledged to be a standard work in the field. *Jones v. Constantino*, 429 Pa.Super. 73, 631 A.2d 1289 (1993). In such cases, the publication is not admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion and the weight to be accorded thereto. *Id.* The opinion of an expert witness may be tested by reference to standard works, or to the works of others which the witness considered in forming his opinion. *McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 533 A.2d 436 (1987). It is also proper to show that an expert is unfamiliar with the literature in a particular field. *Id.*

■ Further, the right of cross-examination extends beyond the subjects testified to in direct testimony and includes the right to examine the witness on any facts tending to refute inferences or deductions arising from matters the witness testified to on direct examination. *Kemp v. Qualls*, 326 Pa.Super. 319, 473 A.2d 1369 (1984). Every circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge is a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination. *Id.*

■ Even assuming that the cross-examination of Monsanto's expert witnesses was improper, and we are not conceding that it was, such error would be, at the most, harmless. Monsanto's witnesses testified over numerous days and were questioned about numerous documents. Given the length of the testimony and the number of documents shown or read to the witnesses, the inclusion of a few improper questions or the publication of an inadmissible document does not warrant the grant of a new trial.

Monsanto next argues that the Court erred in admitting the deposition testimony of former Monsanto employees William B. Papageorge and George J. Levinskas. Monsanto contends that this testimony introduced negligence concepts into the case and introduced evidence regarding Monsanto's knowledge and conduct after the sale of the products involved in the case. The deposition testimony was admitted, not for the purpose of proving Monsanto's knowledge and conduct after the sale of PCBs, but rather was offered for the purpose of establishing that PCBs raised health and environmental concerns. Their testimony was therefore relevant and the Court properly admitted it.

Monsanto next argues that the Court erred in permitting Plaintiffs to admit rebuttal evidence through the testimony of the Department of Transportation employee Bonnie Cvejkus.

■ Admission of rebuttal evidence is a matter within the sound discretion of the trial court. *Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958 (2001). Some rebuttal evidence may be offered as a matter of right, while other rebuttal evidence, even that evidence which should have been given in a case in chief, can be admitted within the discretion of the trial court provided the action of the court is not arbitrary or capricious. *Mitchell v. Gravely International Inc.*, 698 A.2d 618 (Pa.Super.1997). Rebuttal evidence is proper where it is offered to discredit testimony of an opponent's witness. *Mitchell v.*

*Gravely Intern., Inc.,* 698 A.2d 618 (Pa.Super.1997). Where the evidence proposed goes to the impeachment of his opponent's witness, it is admissible as a matter of right. *Clark v. Hoerner,* 362 Pa.Super. 588, 525 A.2d 377 (1987).

 Cvejkus was permitted to testify about the presence of smoke and soot in the ground floor and basement and renovations to various floors of the T & S Building as well as plans for future renovation. Her testimony was presented to rebut testimony from Monsanto's witnesses, Fire Chief Konkle and John Woodyard. Thus, the Court properly admitted Cvejkus' testimony.

Monsanto next argues that the Court erred in refusing to grant Monsanto four peremptory challenges. The law regarding peremptory challenges is controlled by Rule 221 of the Pennsylvania Rules of Civil Procedure, Pa. R.C.P. No. 221, which provides:

> Each party shall be entitled to four peremptory challenges, which shall be exercised in turn beginning with the plaintiff and following in the order in which the party was named or became a party to the action. In order to achieve a fair distribution of challenges, the court in any case may
>
> (a) allow additional peremptory challenges and allocate them among the parties;
>
> (b) where there is more than one plaintiff or more than one defendant or more than one additional defendant, consider any one or more of such groups as a single party.

 The explanatory note to Rule 221 explains that "[t]he trial judge can best determine what is fair in a particular case by the circumstances that appear at the time of jury selection." A trial court abuses its discretion, and thus commits reversible error, only when the trial court's allocation of strikes failed to result in a fair distribution of challenges. *Leaphart v. Whiting Corp.,* 387 Pa.Super. 253, 564 A.2d 165 (1989), *petition for allowance of appeal denied,* 525 Pa. 619, 577 A.2d 890 (1990).

 In the exercise of its discretion, the Court granted each defendant, U.S. Mineral, Monsanto, CertainTeed and Courtaulds, two peremptory challenges; the Court granted Plaintiffs eight peremptory challenges. At the time the Court granted the peremptory challenges, the defendants' interests were sufficiently similar to be considered a single party. The Court did not abuse its discretion in awarding each of the four defendants two peremptory challenges and awarding Plaintiffs eight peremptory challenges.

 Monsanto next argues that the Court erred in prohibiting the use and barring the admission of illustrative exhibits explaining complicated toxological concepts addressed by Robert James, Ph.D. The avoidance of unfair surprise to an adversary concerning the facts and substance of an expert's proposed testimony is the primary purpose of the rule requiring that testimony be within the fair scope of the pretrial report. *Pascale v. Hechinger Co. of Pennsylvania,* 426 Pa.Super. 426, 627 A.2d 750 (1993). The Court did not abuse its discretion in excluding the exhibits where Plaintiffs would be unfairly surprised by the information contained therein.

 Finally, Monsanto argues that the Court erred in excluding evidence that Plaintiffs mistakenly waived tens of millions of dollars in fire insurance coverage. The collateral source rule provides that payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer. *Nigra v. Walsh,*

797 A.2d 353 (Pa.Super.2002). This rule was intended to avoid precluding a claimant from obtaining redress for his or her injury merely because coverage for the injury was provided by some collateral source, e.g. insurance. *Beechwoods Flying Service, Inc. v. Al Hamilton Contracting Corp.*, 504 Pa. 618, 476 A.2d 350 (1984). The principle behind the collateral source rule is that it is better for the wronged plaintiff to receive a potential windfall than for a tortfeasor to be relieved of responsibility for the wrong. *Moorhead v. Crozer Chester Medical Center*, 564 Pa. 156, 765 A.2d 786 (2001).

 Where evidence of insurance is relevant to the issues in the case, it will not be barred merely because it might be prejudicial. *Beechwoods.* Evidence of insurance was not relevant to the ultimate issues in the case. Therefore, the Court properly excluded evidence relating to the fire insurance on the T & S Building.

### Jury Instructions

Monsanto next argues that the Court erred in charging the jury (1) on the measure of damages for damage to the T & S Building; (2) on the measure of damages for personal property; (3) on relocation damages; and (4) in instructing that it was for them to determine whether damages apportionment was appropriate, that it was for the jury to apportion such liability, and that as against U.S. Mineral, the jury was to consider only Plaintiffs' evidence.

 Generally, a trial judge has wide latitude in his or her choice of language when charging a jury, provided that the instruction fully and adequately conveys the applicable law. *Birth Center v. St. Paul Companies, Inc.*, 727 A.2d 1144 (Pa.Super.1999). A motion for a new trial should be granted where the reading of the jury charge against the background of the evidence reveals that the jury charge might have been prejudicial to the complaining party. *Salameh v. Spossey*, 731 A.2d 649 (Pa.Cmwlth.1999). An error in a jury charge is sufficient ground for a new trial if the charge, taken as a whole, is inadequate, unclear, or has the tendency to mislead or confuse rather than to clarify a material issue. *Von der Heide v. Department of Transportation*, 553 Pa. 120, 718 A.2d 286 (1998).

 Taken as a whole, the Court's charge clearly and appropriately explains the relevant law on the measure of damages for damage to the T & S Building, on the measure of damages for personal property, and on relocation costs. Under Section 433A of the Restatement (Second) of Torts, damages for harm may be apportioned among two or more causes where there are distinct harms or there is a reasonable basis for determining the contribution of each cause to a single harm. The trial court must determine, as a matter of law, whether the harm is capable of apportionment. *Martin v. Owens–Corning Fiberglas*, 515 Pa. 377, 528 A.2d 947 (1987). If the trial court concludes that there is sufficient evidence presented for the jury to make a reasonable determination apportioning damages, then the actual apportionment is to be left to the jury. *Corbett v. Weisband*, 380 Pa.Super. 292, 551 A.2d 1059 (1988). By instructing the jury on apportionment, the Court made an implicit ruling that the harm was capable of apportionment. The evidence presented was sufficient to enable the jury to apportion the damages among the defendants.

Monsanto also argues that the Court erred in refusing Monsanto's proposed charge regarding (1)the burden of proving a product unsafe for intended use; (2) unintended use; (3) definition of defect; (4) the limitation of liability for a compo-

nent material supplier; (5) proximate causation; and (6) directed verdict.

■ A refusal to give a proper instruction requested by a party is grounds for a new trial only if the substance of that instruction was not otherwise covered by the trial court's general charge. *Burke v. Buck Hotel Inc.*, 742 A.2d 239, 246 (Pa. Cmwlth.1999). Additionally, the trial court is not bound to use the exact language of a requested jury charge; it may choose another form of expression so long as it adequately and clearly covers the subject. *Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298 (Pa.Super.1999).

Taken as a whole, the Court's charge adequately explained the law regarding product defect, causation and the substantial factor test for proximate causation. Thus, the Court did not err in refusing to give Monsanto's requested instructions.

### Remittitur

Finally, Monsanto argues that the Court should grant remitter because the verdict is plainly excessive and exorbitant.

■ A jury is given wide latitude to fashion a verdict on damages. *Neison v. Hines*, 539 Pa. 516, 653 A.2d 634 (1995). The large size of a verdict by itself is not evidence of excessiveness. *Layman v. Doernte*, 405 Pa. 355, 175 A.2d 530 (1961). The standard to be used in determining whether remittitur should be granted is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. *Doe v. Raezer*, 444 Pa.Super. 334, 664 A.2d 102 (1995), *petition for allowance of appeal denied*, 544 Pa. 630, 675 A.2d 1248 (1996). A trial court may only grant a request for remittitur when a verdict that is supported

by the evidence suggests that a jury was guided by partiality, prejudice, mistake or corruption. *Bindschusz v. Phillips*, 771 A.2d 803 (Pa.Super.2001).

There was ample evidence at trial to establish that the presence of PCBs in the T & S Building was a substantial factor in causing Plaintiffs' damages. There is also ample evidence of the amount of damages Plaintiffs sustained as a result of the PCBs. Accordingly, we will deny Monsanto's request for remittitur.

### ORDER

AND NOW, this 16th day of October, 2002, upon consideration of Monsanto Company's motion for post-trial relief and Plaintiffs' response thereto, said motion is denied.